## Dozier v. Fidelity & Casualty Co. of New York.

*(Circuit Court, W. D. Missouri, W. D.   June 8, 1891.)*

ACCIDENT INSURANCE—SUN-STROKE.
   "Sun-stroke or heat prostration," contracted by the decedent in the course of his ordinary duty as a supervising architect, is a disease, and does not come within the terms of a policy of insurance against bodily injuries, sustained through external, violent, and accidental means," but expressly excepting "any disease or bodily infirmity."

At Law.   On demurrer to petition

This is an action on an accident insurance policy.   The assured, Willoughby L. Dozier, on the 26th day of April, 1890, took out a policy of insurance in the defendant company, which, by its terms, would expire on the 26th day of April, 1891.   The assurance was "against bodily injuries sustained through external, violent, and accidental means." It did not cover "any disease or bodily infirmity."   The insured was, by occupation, a supervising architect.   The petition, by his wife, the named beneficiary, alleges that the assured, while in the discharge of his ordinary avocation, and without any voluntary exposure on his part, came to his death on the 23d day of June, 1890, "by sun-stroke or heat prostration."   To this petition the defendant demurs, on the ground that the petition does not state facts sufficient to constitute a cause of action, in that it shows on its face that the alleged injury was not accidental, within the meaning of the policy.

*John L. Pealk,* for plaintiff.
*Warner, Dean & Hagerman,* for defendant.

PHILIPS, J., *(after stating the facts as above.)*   The question to be decided is whether or not death resulting from sun-stroke or heat prostration comes within the means of injury insured against.   This precise question does not appear to have been passed upon by any American court, but it is not too much to say, perhaps, that it may be regarded as settled in the negative in England by the opinion of Chief Justice COCKBURN in *Sinclair* v. *Assurance Co.,* 3 El. & El. 478.   The policy there assured against "any personal injury from, or by reason or in consequence of, any accident which should happen to him upon any ocean, sea, river, or lake."   The assured was master of the ship Sultan, and in the course of his voyage he arrived in the Cochin river, on the south-west coast of India, and in the usual course of his vocation he was smitten by a sun-stroke, from the effect of which he died.   On full consideration, it was held that his death must be considered as having resulted from a natural cause, and not from accident, within the meaning of the policy.   The policy there did not, as here, contain the words "external, violent," and yet the learned chief justice held that the term "accident," as used in the policy, involved necessarily some violence, casualty, or *vis major.*   He says:

"We cannot think disease produced by the action of a known cause can be considered as accidental. Thus disease or death engendered by exposure to heat, cold, damp, the vicissitudes of climate, or atmospheric influences, cannot, we think, properly be said to be accidental; unless, at all events, the exposure is itself brought about by circumstances which may give it the character of accident. Thus, by way of illustration, if, from the effects of ordinary exposure to the elements, such as is common in the course of navigation, a mariner should catch cold and die, such death would not be accidental; although if, being obliged by shipwreck or other disasters to quit the ship, and take to the sea in an open boat, he remained exposed to wet and cold for some time, and death ensued therefrom, the death might properly be held to be the result of accident. It is true that, in one sense, disease or death through the direct effect of a known natural cause, such as we have referred to, may be said to be accidental, inasmuch as it is uncertain beforehand whether the effect will ensue in any particular case. Exposed to the same malaria or infection, one man escapes, another succumbs. Yet diseases thus arising have always been considered, not as accidental, but as proceeding from natural causes. In the present instance, the disease called 'sun-stroke,' although the name would at first seem to imply something of external violence, is, so far as we are informed, an inflammatory disease of the brain, brought on by exposure to the too intense heat of the sun's rays. It is a disease to which persons exposing themselves to the sun in a tropical climate are more or less liable, just as persons exposed to the other natural causes to which we have referred are liable to disastrous consequences therefrom. The deceased, in the discharge of his ordinary duties about his ship, became thus affected, and so died."

According to this high authority, a disease produced by a known cause cannot be considered as accidental. This conclusion has been accepted as authoritative by text-writers. Bliss, Ins. § 399; May, Ins. (3d Ed.) § 519. If sun-stroke or heat prostration is properly classified among diseases, it is expressly excepted from the operation of this policy. It is discussed in works on Pathology under the head of diseases of the brain. Niemeyer in his work on Practical Medicine, (vol. 2, pages 181, 182,) treats of it under the head of "Diseases of the Brain." He asserts that the investigations and experiments of so renowned a specialist as Obernier have entirely exploded the once common notion that sun-stroke, or *insolatio*, depends on hyperæmia of the brain, induced by the action of the sun's rays on the head. The rays of the sun are not essential to it. "It is now known that in this disease there is a serious derangement of the heat-producing function, and a great rise in the bodily temperature, which, in extreme case, may reach 109 degrees or 110 degrees Fahr." And he concludes that, while nothing is yet known of the anatomical lesions upon which sun-stroke depends, yet "the disorder has a definite material basis." A standard Encyclopaedia (Britannica, vol. 22, p. 666) terms it a "disease," and prescribes its methods of treatment. From this and other standard works we collate the following facts: That it is a term applied to the effects upon the central nervous system, and through it upon other organs of the body, by exposure to the sun or to overheated air. "Although most frequently observed in tropical regions, this disease also occurs in temperate climates during hot weather. A moist condition of the atmosphere, which interferes with the cooling of

the overheated body, greatly increases the liability to suffer from this ailment." The common notion that sun-stroke or "heat prostration," as it is termed in the petition, comes like a stroke of lightning from a piercing ray of the sun, is utterly at fault. It affects persons frequently during the night. It often results from overcrowding in quarters, as in the case of soldiers in barracks, and to persons in poorly ventilated rooms. Also persons whose employment exposes them to heat more or less intense, such as laundry workers and stokers, are apt to suffer from this in hot seasons. "Causes calculated to depress the health, such as previous disease, particularly affections of the nervous system, anxiety, worry, or overwork, irregularities in food, and, in a marked degree, intemperance, have a predisposing influence; while personal uncleanliness, which prevents, among other things, the healthy action of the skin, the wearing of tight garments, which impede alike the functions of heart and lungs, and living in overcrowded and insanitary dwellings, have an equally hurtful tendency." Longmore, in his reports of cases occurring in the British army in India, where it is quite prevalent, attributes it much to the foul air and badly ventilated quarters, and he also speaks of its pathological conditions. In all its forms, ranging from "heat syncope" and "heat apoplexy" to "ardent thermic fever," it is subjected to medical treatment as a disease, and its fatality is estimated at 40 to 50 per cent. With what propriety for accuracy, therefore, can this malady be termed an accident, any more than cholera, small-pox, or yellow fever, or apoplexy? It may be an accident that a person is exposed to it, but the conditions under which the human system may be affected by it, certainly belong to natural causes, which may reasonably be anticipated, as they come not by chance. The term "accident," as used in the policy, is presumed to be employed in its ordinary, popular sense, which means "happening by chance;" "unexpectedly taking place;" "not according to the usual course of things." So that a result ordinarily, naturally, flowing from the conduct of the party cannot be said to be accidental, even where he may not have foreseen the consequences.

It is not deemed essential to a vindication of the correctness of the conclusion reached to review the various American decisions illustrating the application of the term "accidental" employed in such policies further than to note the palpable distinction between them and the case at bar. Death by drowning is accidental, as there is present the *vis major*, external and violent, producing asphyxia, and in the act producing the injury there is something unforeseen, unexpected, and unusual. May, Ins. § 516. In *Association* v. *Barry*, 131 U. S. 100, 9 Sup. Ct. Rep. 755, the assured, after two other persons had jumped from a platform five feet from the ground with safety, also jumped therefrom, followed, as to him, with serious consequences, producing a stricture of the duodenum, from which death ensued. In that case the deceased intended to, and thought that he would, alight safely, and it was a question for the jury to say whether or not it was an accident that he did not. The court say:

"If the death is such as follows from ordinary means voluntarily employed in a not unusual or unexpected way, it cannot be called a result effected by

accidental means; but if in the act which precedes the injury something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means."

In *Association* v. *Newman*, 84 Va. 52, 3 S. E. Rep. 805, the assured was found dead in his bed early in the morning, caused evidently by inhaling coal gas. The case turned upon the question whether or not this gas was a poison or poisonous substance, within the meaning of the exception contained in the policy. The controversy among the experts was as to whether death resulted from carbonic oxide or carbonic acid, and as to their resultant poisonous power, both causing death by suffocation. Such a death clearly came within the term "accidental," and it was left to the jury to determine whether or not carbonic oxide is poisonous within the meaning and intent of the words "poison" and "poisonous" as used in the policy. This course was pursued by the court in view of the conflict in the testimony as to whether such gases were strictly "poisonous" in the ordinary acceptation to be imputed to such term in the policy. These cases do not present the question of an accident and disease as in the case at bar. In *Bacon* v. *Association*, (Ct. App. N. Y. Oct. 14, 1890,) 25 N. E. Rep. 399, it was held that death resulting from a malignant pustule, caused by the infliction upon the body of diseased animal matter containing *bacillus anthrax*, is death from disease, and not within the terms of an accident policy similar to the one under consideration. It was likened to what is called "wool sorter's disease," because it happens to people who handle wool and hides, such as tanners, butchers, and herdsmen. Although the medical experts admitted that this species of malady belonged to pathology, yet they attempted to except this instance from the classification of diseases by defining it as "a pathological condition, and succumbing of the body to the infliction of this particular poison." But the court held that a pathological condition "means neither more nor less than a diseased condition of the body," and therefore, as the policy expressly excepted bodily infirmity or disease, there could be no recovery. The court say: "No abrasion of the skin is needed to produce the contact of the *bacilli*, and what follows from such contact seem to be as plainly a disease as in the case of small-pox or typhoid fever." Sun-stroke seems to be recognized by the courts in New York as a disease. In *Boos* v. *Insurance Co.*, 6 Thomp. & C. 364, the contention was as to whether the court should take judicial cognizance of the fact that sun-stroke was "a serious disease," within the terms of the policy. There seemed to be no question made that it was not a disease, but whether the fact of its seriousness should be left to the determination of the jury. Courts may take cognizance of facts generally known and recognized in nature, science, and history. They will take notice of processes in art and science, the results of which are matters of common knowledge. *Brown* v. *Piper*, 91 U. S. 37. They will take notice of the art of photography, and its production of correct likenesses. *Udderzook's Case*, 76 Pa. St. 340; *Cozzens* v. *Higgins*, 1 Abb. Dec. 451. Also, that coal oil is inflammable. *State* v. *Hayes*, 78 Mo. 318. So should courts take notice that fever in its multiform grades is a dis-

ease, and I apprehend, in view of the universal assignment of apoplexy in pathology among the diseases of the brain, that it would not be seriously questioned that courts in trials before juries may assume it to be a bodily disease.

It is suggested in argument by the learned counsel for plaintiff that at some time anterior to the issuance of this policy the defendant's policies contained an express exception against injury by sun-stroke, and that in its circulars distributed at the time the policy in question was issued it asserted that practically all the old conditions had been expunged from its policies. It is therefore argued that this was tantamount to an assurance on its part that sun-stroke would thenceforth be regarded by it as expressed within the terms "external, violent, and accidental." What the facts are touching this assertion the court cannot know, and what the law arising thereon may be the court is not required on this issue to say, as no such facts appear in the petition. The court can look alone to the petition in passing on the demurrer. The demurrer admits only such facts as appear on the face of the petition, and such as are well pleaded.

It results that the demurrer is sustained.