## Pack v. Prudential Casualty Company.

(Decided May 9, 1916.)

### Appeal from Boyd Circuit Court.

1. Insurance—Accident Policy—Sunstroke.—An accident insurance policy furnishing indemnity "if sunstroke caused by the direct effect of the sun's rays accidentally suffered by the insured shall result directly, independently and exclusive of all other causes in the death of the insured," protects the insured against sunstroke that could not reasonably be anticipated and which occurred while he was going about his business in the usual way.

2. Insurance—Accident Policy—Sunstroke.—Under an accident policy affording protection against sunstroke, a laborer on a public work, who suffered a sunstroke at a time when it could not reasonably have been expected that a sunstroke would follow as a natural and probable result of his work, was entitled to the indemnity provided for in the contract.

3. Insurance—Accident Policy—Sufficiency of Evidence.—Where an insured sustained a sunstroke on June sixth and died from pneumonia on July tenth, the evidence failed to show any reasonable

or natural connection between the sunstroke and his death and therefore the company was not liable.

JOHN W. WOODS and A. T. BRYSON for appellant.

WATT M. PRITCHARD and PROCTOR K. MALIN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Affirming.

In March, 1913, Garfield Pack secured an accident and health insurance policy in the Prudential Casualty Co., with a death benefit of one thousand dollars. The beneficiary of the policy was his wife, the appellant, Julia Pack.

The policy stipulated that it insured Garfield Pack "against death or loss of time on account of disability resulting directly and independently of all other causes, from bodily injuries sustained through external, violent and accidental means.   *   *   *" And under the heading "special death indemnity" there was this clause:

"If sunstroke, caused by the direct effect of the sun's rays, or freezing, septicaemia, or hydrophobia, or the involuntary and unconscious inhalation of gas or other poisonous vapor, accidentally suffered by the insured, shall result directly, independently and exclusively of all other causes, in the death of the insured within ninety days from date of exposure or infection, the company will pay the beneficiary hereinbefore named the principal sum of this policy, and the company shall not be liable under any other provision of this policy for death so caused."

On July 10th, 1913, Garfield Pack died, as claimed by the beneficiary, from the effect of sunstroke, and thereafter the beneficiary demanded from the company the indemnity of one thousand dollars, and in addition fifty dollars to which she claimed to be entitled under other provisions of the policy.

The company denied all liability, and thereupon the beneficiary brought this suit.

On the trial of the case before a jury, after the evidence of both parties had been introduced, the trial court directed a verdict for the Casualty Company, and the beneficiary prosecuted this appeal.

There are two questions presented for our consideration: first, the proper construction of the contract of

insurance; and, second, the sufficiency of the evidence to take the case to the jury.

The petition charged "that on the tenth day of July, 1913, while said policy was in full force and effect, the said insured, Garfield Pack, died from the effect of sunstroke, caused by the direct effect of the sun's rays, which he had received previous thereto, to-wit., on or about the fifth day of June, 1913, and independently of all other causes, the said sunstroke, resulting in the said insured's death within ninety days of the time when he received said injuries. She says that the insured received the said sunstroke while he was working for the Ohio Valley Electric Railway Co., as a section hand repairing track of the said company."

A review of the evidence produced on the trial shows that on Friday morning, July 6th, while at work, Pack complained of being sick; that it was a hot day and he looked red; that when the men went to eat their dinner under a tree Pack opened his basket but did not eat anything; that a little while after dinner they all went to work, but Pack only worked a short time and then quit; that he did not return to work until Monday; that he was a strong, healthy, fleshy man about forty-two years old; that he died on July tenth of pneumonia and had been sick with diarrhea for about ten days before he died; that when he came home on June sixth he looked red and flushed and did not eat any supper; that that night he complained of his head hurting and of diarrhea; that on the next day he also complained of his head and vomited a time or two; that on the following Monday, June 9th, he went back to work and worked about ten hours a day each day until June 20th, when he quit, and after this went about until June 27th when he first called in a doctor.

Dr. DeBord testified as follows: "Q. When were you called to see him during his last illness? A. As well as I remember it was about the 28th of June, 1913. Q. What was his condition when you called on him at that time? A. Well, when I found him, whenever it was, he had diarrhea and cramping and a headache—complained of headache, flushed face with veins distended in his face frequently—rapid pulse. Q. How did the disease progress then from that time on until his death? Just tell the jury about it. A. Well, the first day I was up to see

him it seemed that the diarrhea was hurting him worse than anything else. I think the second or third trip I saw him the diarrhea was checked; he had got better of that, he had got better of throwing up, and for about a couple of days there he got better and about—as near as I remember, about the 6th of July he developed this trouble with his heart and his lungs. Q. Go ahead and describe that. A. Well, he had—it seems that my diagnosis was that of pneumonia. It set in about the 6th of July—about four days before he died, and it run a rapid gait. His temperature went up, and I called in Dr. Kercheval, and we didn't altogether decide whether he had pneumonia. Q. Now from the history of the case and from the symptoms you observed while treating this man—what would you say caused his death? A. From the history of the case—I got a good, plain history, he had been over heated some few days before, or sunstruck, or over heated whatever you want to call it, all the same. But his history was that he was first struck down with it and that he got up after a while and went back to work and worked a while and then had to lay off a few days; that he went back to work again and every time he got in the sun he would get heated and he would begin to weaken down; couldn't stand the heat; that he tried for several days and then quit again. That is a condition of sunstroke; every time he would get in the sun he would weaken down again and still this diarrhea kept up all the time, up until after I got to treating him; and following over heating or sunstroke there is a fever that is called thermic fever, which runs a course. Q. Just tell what you know about it yourself. Now considering all the history of the case and what you found there, what would you say caused his death? A. Well, according to history, all the way we can make our judgments—the history of the case and from what I found there, that the man was over heated in the first place, which lead to this other trouble. * * * Q. What about the vomiting and diarrhea? A. Vomiting and diarrhea is things that come after that, that follows afterwards, yes —this may not be present just at the time. Q. You mean be present at the time the person is stricken? A. Yes. Q. What about being over heated? A. Being over heated, you have headache. Q. How will a person look in the face? A. Flushed face."

On his cross-examination he testified as follows: "Q. When you visited him, doctor, on the 28th of June, you found him suffering with diarrhea? A. Yes, sir. * * * Yes, he had this diarrhea or vomiting one, I think, about the second or third trip I went back, and the next trip it seemed like I had got that checked on him. Q. And then after that pneumonia followed? A. Yes, sir, practically. Q. That was your judgment that it was pneumonia? A. That is our judgment. Q. That is your judgment now? A. Yes. Q. And you say the symtoms of sunstroke are yawning and gaping and sighing and fainting? A. Yes, sir; at the beginning, when they are first sunstruck. Q. Very often a person faints from being over heated that don't have a sunstroke? A person will faint from different causes? A. Yes, sir. They are caused by different causes. Q. Generally caused by eating? A. Yes, and different things. Q. I understand that it is generally caused by something a man gets into his stomach? A. I don't know that it is more caused from that than from other things. Q. That is one of the causes? A. Yes, one of the causes—getting food in the stomach that won't digest. Q. Bad digestion a cause of diarrhea? A. Yes. Q. And there are a good many causes for vomiting besides over heating? A. Yes, other causes for it. Q. And pneumonia comes from a germ, don't it? A. Some authorities claim it don't, but the authorities in this matter, among the best authorities—you can take the best of authorities and they say that in a great majority of these cases it will develop into pneumonia. Q. Did I ask you that? I asked you if pneumonia didn't come from a germ? A. I told you some authorities claim it does and some claim it don't. Q. What do you say about it? A. All I got is what the authorities say, enough as it is. Q. What do you say to the jury about that, that it does or does not—or that you don't know? A. Well, I don't know whether it is caused from a germ. Q. A condition of vomiting comes from a disordered condition of the stomach, does it not? A. Yes, sir. This disordered condition of the stomach may cause a reflex of the nerve system—over heated or a sunstroke does affect the nerve centers of the brain. Q. Now the ordinary causes of vomiting are what we would call a disordered stomach, is it not? A. Yes. Q. And you have got to have a disordered condition of the stomach before you can have vomiting? A. Yes, have to be a disordered stomach be-

fore you can have vomiting. By the court: Is there any difference between the symptoms of a sunstroke and being over heated from other causes? A. Well, there is a difference, but these differences may vary; two persons might have a sunstroke and not be the same symptoms in the one as in the other. Q. Ordinarily what would be the difference in the symptoms of a sunstroke and being over heated from some other cause—the effect the same way generally? A. I don't really remember about that— I don't know.''

With the evidence substantially as we have stated, the argument is made by counsel for the Casualty Company that although it should be considered that this evidence was sufficient to show with reasonable certainty that the death of Pack was due to sunstroke, the action of the lower court in directing a verdict was correct, because the policy contract did not cover death from sunstroke under the circumstances shown. The policy contract sets out in the beginning that ''this policy provides indemnity for loss of life, or sight, dismemberment, or loss of time due to accidental injuries, and for loss of time due to sickness, subject to all conditions and limitations contained therein.'' And it is urged that as the purpose of the policy was to furnish indemnity only against death or injury from accidental causes, the sunstroke from which appellee suffered was not an accident within the fair meaning of the contract.

In support of this position the argument is made that it is not the injury or death that comes from an accident that determines whether or not the thing that produced it was an accident within the meaning of the policy, but it is the means or circumstances that preceded or brought about the accident which determine its quality. For example, if a passenger on a train should be compelled without his fault to leave the train between stations and be obliged to walk to the nearest station and on the way should suffer sunstroke, this would be an accidental sunstroke, because it was occasioned by an unforeseen accident; but if the passenger voluntarily, and for some purpose of his own, left the train, and while walking to the station met with a sunstroke, it would not be an accident, although he could not reasonably have anticipated that sunstroke would follow his act of walking. Authorities giving some support to this contention

are: Schmid v. Indiana Travelers' Accident Assn., 42 Ind. 483; Smith v. Travelers' Ins. Co., 219 Mass. 147, 54 L. R. A. (N. S.) 872; Lehman v. Great Western Accident Assn., 155 Iowa 737, 42 L. R. A. (N. S.) 562; Elsey v. Fidelity & Casualty Co. (Indiana), 109 N. E.

But we cannot agree that the views expressed in these authorities should control this case, although it is clear that if this construction should be adopted the sunstroke clause would not indemnify Pack against death, if we should assume that his death was directly caused by sunstroke independent of other causes, because when Pack was stricken he was voluntarily pursuing in the usual way his regular occupation, and there was nothing unusual in what he was doing, nor did anything unexpected or unforeseen or accidental precede the stroke.

We do not think it would be a fair or reasonable construction of the contract to exempt the company from liability if the death of Pack was caused directly by a sunstroke. The policy expressly recognizes that death may result from sunstroke accidentally suffered and undertakes to indemnify the insured against an accident of this nature. So that if we should come to apply the provisions of this policy to death caused directly by sunstroke, the only question left open would be whether or not a sunstroke suffered under the circumstances described was accidental within the meaning of the policy. The policy stipulates that the company will pay the beneficiary the principal sum of this policy "if sunstroke caused by the direct effect of the sun's rays,    *    *    * accidentally suffered by the insured shall result directly, independently and exclusively of all other causes in the death of the insured within ninety days from the date of the exposure."

Now is this indemnity to be limited to sunstroke that is preceded by and caused by an accident or an unforeseen or unexpected event; or is it to embrace sunstroke produced by causes that could not be reasonably anticipated and which occur while the insured is going about his business in the usual way? If the latter, then this clause would cover a sunstroke suffered under the circumstances described in the evidence, because it is a matter of common knowledge that sunstroke in this climate is not the natural or probable result of engaging in ordinary manual labor on a warm summer day. On the contrary, it is a very unexpected and unusual occurrence.

It is so rare indeed that it may well be called an accident, which is defined by Webster as "an event that takes place without one's foresight or expectation. An undesigned, sudden and unexpected event, * * * happening by chance or unexpectedly, taking place not according to the usual course of things." The same definition in different words is found in Corpus Juris, Vol. 1, page 390, and in A. & E. Ency of Law, Vol. 1, page 293. And this definition of an accident seems peculiarly fitted to the facts of this case. Here Pack was engaged with other laborers in doing ordinary manual labor such as great numbers of laboring men are engaged in every day. They are accustomed to working in exposed places on hot days and do not anticipate any ill effects from the heat. Occasionally perhaps one of them may have a sunstroke, but if he does it is such an unexpected, unforeseen and unusual thing as to come well within the definition of an accident.

Unless the clause in this contract providing indemnity against sunstroke is construed to embrace cases like the one we have, it is deceptive and misleading and fails to afford the protection its reading implies. If an insured who should suffer sunstroke when engaged in his usual occupation or in doing the things he usually does, is not to be protected by this clause in the policy, it has little beneficial meaning, for, according to the construction contended for, the insured would not be protected in any state of case unless the sunstroke happened while the insured was by accident or misfortune involuntarily placed in a position or surrounded by conditions that would subject him to the rays of the sun in an unexpected and unforeseen manner.

It is of course true that sunstroke suffered in this way would be accidental, but not more so than would sunstroke suffered under ordinary conditions when it could not be reasonably anticipated or foreseen that it would happen.

The very purpose of accident insurance is to protect the insured against accidents that occur when he is going about his business or attending to his work or affairs in the usual way without any thought of being injured or killed, and when there is no probability, in the ordinary course of human experience, that he will meet with accident or death. The reason why men secure accident insurance is to protect them against unforeseen and un-

expected accidents that may happen in the ordinary course of their lives and when they are pursuing in the usual way their daily vocations, or doing in the ordinary way the things that men do in the common, every-day affairs of life.

Nearly all accidents happen when people are going about their business in the usual way and are voluntarily doing the things before them to do. There are many clauses in this policy protecting the insured against accidental injury or death, and if the argument of counsel is sound when applied to the sunstroke clause in the policy, there seems no good reason why the construction contended for should not embrace all of the other indemnity features, with the result that the insured would find himself without protection against the very things for which he secured the insurance as indemnity.

We therefore hold that although Pack was voluntarily engaged in working in the sun, the sunstroke was, nevertheless, an accident that he could not reasonably have foreseen or anticipated, although if it might have reasonably been expected that a sunstroke would follow as a natural and probable result of his work on this hot day, the stroke was not an accident within the meaning of the policy; American Accident Co. v. Reigart, 94 Ky. 547; American Accident Co. v. Carson, 99 Ky. 441; Massachusetts Bonding and Insurance Co. v. Duncan, 166 Ky. 515; General Accident & Life Assurance Corp. v. Meredith, 141 Ky. 92; Bryant v. Continental Casualty Co. (Texas), 182 S. W. 673; Western Commercial Travelers' Assn. v. Smith, 85 Fed. 401, 40 L. R. A. 653; Fidelity & Casualty Co. v. Carroll, 143 Fed. 271, 5 L. R. A. (N. S.) 657.

The remaining question is the sufficiency of the evidence to show that the death of Pack was due directly, independently and exclusive of all other causes to sunstroke. Unless it was the policy did not furnish indemnity. Upon this issue we think the beneficiary failed to make out a case. The evidence does not sufficiently show any reasonable or natural connection between the sunstroke on the sixth day of June and the death from pneumonia on the tenth day of July, or that the death of Pack was due directly and exclusive of all other causes to sunstroke. On the record as we read and understand it, leaving out of view the evidence for the casualty company showing that the sunstroke could not under the facts

stated have produced the pneumonia, it would be the merest speculation to say that Pack died from the effects of the sunstroke. Aetna Life Ins. Co. v. Bethel, 140 Ky. 609.

The judgment is affirmed.