## RICHARDS v. STANDARD ACC. INS. CO.

No. 3665.  Decided September 24, 1921.  (200 Pac. 1017.)

1.  INSURANCE—SUNSTROKE COVERED BY INSURANCE AGAINST BODILY INJURIES BY ACCIDENTAL MEANS. Sunstroke from the direct rays of the sun, though scientifically a disease, is popularly understood as an accident, and is covered by a policy insuring bodily injuries by accidental means.[1]

2.  INSURANCE—POLICIES CONSTRUED LIBERALLY IN FAVOR OF INSURED. Insurance policies should be construed liberally in favor of the insured and their beneficiaries.

3.  INSURANCE—DEATH FROM SUNSTROKE COVERED BY POLICY INSURING AGAINST BODILY INJURY BY "ACCIDENTAL MEANS," THOUGH ACCIDENTAL DEATH NOT COVERED. Death from sunstroke is covered by a policy insuring against bodily injuries by accidental means, though such policy does not insure against accidental death; death or injury, if not the natural and probable result of a voluntary and intentional act by insured, or if something unforeseen, unexpected, or unusual occurs in the act preceding the injury, being the result of accidental means.

---

[1] *Salt Lake City* v. *Salt Lake City W. & E. P. Co.*, 54 Utah, 10, 174 P. 1134.

Appeal from Third District

4.  INSURANCE—BENEFICIARY MAY RECOVER FOR INSURED'S DEATH
    FROM SUNSTROKE IN DESERT DUE TO MISCALCULATION OF DISTANCE
    TO BE TRAVELED.  Under a policy insuring against bodily in-
    juries from accidental means, the beneficiary could recover
    where insured, a mining engineer, died from sunstroke in the
    desert while returning from a trip on foot to a mining prospect,
    which was represented to him as only six instead of ten miles
    distant; such misrepresentation or miscalculation of the dis-
    tance being an accidental, unexpected, and unforeseen event.

5.  INSURANCE—EVIDENCE HELD INSUFFICIENT TO SHOW DEATH FROM
    SUNSTROKE CAUSED BY VOLUNTARY EXPOSURE.  In an action on
    a policy insuring against bodily injuries from accidental means,
    where insured died from sunstroke in the desert while return-
    ing from an inspection trip on foot to a mine, the distance of
    which had been underestimated, evidence *held* insufficient to
    show that his death was a direct result of his voluntary ex-
    posure to the intense heat.

6.  INSURANCE—BENEFICIARY MAY RECOVER FOR INSURED MINING
    ENGINEER'S DEATH FROM SUNSTROKE IN DESERT.  Under a policy
    insuring against bodily injuries from accidental means, the
    beneficiary could recover for insured's death from sunstroke in
    the desert while returning from a trip on foot to a mine pros-
    pect, the distance of which was misrepresented to him, though
    he could have returned to camp after traveling the shorter dis-
    tance represented; insured, in pursuance of his usual occupa-
    tion of mining engineer, being under no duty to stop at such
    point and weigh the probability of danger in proceeding farther.

7.  INSURANCE—NEGLIGENCE OF INSURED NO DEFENSE.  Under a policy
    insuring against bodily injuries from accidental means, negli-
    gence of the insured, who died from sunstroke in the desert,
    in not taking more water or adopting additional precautionary
    measures, is not a defense.

8.  INSURANCE—VOLUNTARY EXPOSURE TO DANGER NO DEFENSE.  Vol-
    untary exposure to danger is not a defense to an action on a
    policy insuring against bodily injuries from accidental means
    unless insured intended to produce the very result which oc-
    curred, the element of danger being unimportant and immate-
    rial, since persons protected by accident insurance may con-
    sciously incur hazards, which may result in injury or death,
    without forfeiting their insurance, unless the policy expressly
    excepts such hazards.

Appeal from District Court, Third District, Salt Lake
County; *W. H. Bramel,* Judge.

·Action by Louise Odell Richards against the Standard Accident Insurance Company. Judgment for plaintiff, and defendant appeals.

AFFIRMED.

*M. E. Wilson,* of Salt Lake City, for appellant.

*Dey, Hoppaugh & Mark,* of Salt Lake City, for respondent.

WEBER, J.

Plaintiff sued defendant, an insurance company, on an accident insurance policy in which she was named as beneficiary. Defendant appeals from the judgment entered upon the jury's verdict for $15,000 and interest.

It is charged in the complaint, and admitted in the answer, that on September 17, 1915, an insurance policy was issued by defendant to Joseph Heber Richards, whereby it contracted to insure him in the sum of $15,000 against "loss resulting from bodily injuries effected directly, exclusively and independently of all other causes, through accidental means except when intentionally self-inflicted while sane or insane;" that on June 18, 1917, in the state of Arizona, said Richards died as a result of sunstroke then and there suffered by him; that on said day, and while the policy was in force, he visited a mining prospect in Arizona, and while returning was overcome by heat with fatal result; that plaintiff was the wife of said Richards at the time of his death and is the beneficiary named in the policy. The details of the trip and the facts claimed to constitute "accidental means" resulting in the sunstroke were set forth in an amendment to the amended complaint substantially as they appear in the evidence, the substance of which will be hereinafter stated.

The answer admits that Richards died on the desert from the effects of sunstroke, but alleges that the effect of said sunstroke did not constitute "bodily injuries effected directly, exclusively and independently of all other causes, through ac-

cidental means," and alleges that the death of the insured
was not the result of an accident and that by defendant's
policy of insurance it particularly specified and contracted
that there was no liability on its part to pay any sum what-
ever on account of death by disease, that sunstroke was and
is a disease and specifically excepted from the contract of in-
surance; that in that locality and climate there was nothing
unusual in the character of the weather for that season of the
year, and that the said Richards, of his own volition, and with
knowledge of the climate and heat, and knowing that he had
to pass over a desert country without water or shade on the
road, and under a burning summer sun, undertook to walk
to the mining prospect, a distance of about 16 miles, in his
usual and ordinary way, and that in all the premises Richards
did what he intended to do and not otherwise, and that his
death was the natural result of his own acts.

The undisputed evidence, in substance, is:  Joseph Heber
Richards was a mining engineer and mine promoter.  On the
16th day of June, 1917, he and Bert Vincent, with whom he
was associated, left Salt Lake City and next day arrived at
Las Vegas, Nev., where pursuant to appointment previously
made they met D. F. Watson and M. H. Wheeler.  These four
men procured an automobile and drove from Las Vegas to
the Colorado River, a distance of about 32 miles, for the pur-
pose of examining a certain alleged valuable deposit of man-
ganese claimed to have been discovered by Watson, the claim
being in Arizona on the other side of the river, and, as Wat-
son represented, 6 miles from the Arizona bank of the river.
Arriving at the river on June 17, 1917, the parties con-
structed a boat and crossed the river into Arizona.  Watson,
the prospector, had told his companions that he had two
horses in Arizona which would come to the river at night for
water and they could be caught and the men could ride the
horses double from the river to the mining claim.  Grain and
hay for the horses had been taken in the automobile.  At
about 5:30 in the evening they crossed the river.  They pre-
pared and ate supper and waited for the horses, which, Wat-
son said, "would be down pretty soon."  It was then decided

Richards v. Standard Acc. Ins. Co., 58 Utah 622

to fill their canteens with water and walk a short distance up the "wash" toward the mining claim. Watson said he thought they might "walk up a ways and find the horses." He explained that during the night they would hear the horses going by. They went about three-quarters of a mile and camped. Each slept starked naked on a quilt, the heat being intense. They arose at 3:30 in the morning. The horses had not appeared. At 3:45 a. m. they started to walk to the mining claim, each having a two-quart canteen of water. When they had gone about 6 miles they stopped and had breakfast. It was then about 5:30 or 5:45 a. m. At that time they had consumed but little of their water. Their supply of water would have been ample for the trip to the mining claim and return had the distance been only 6 miles as represented by Watson. They continued walking, the old prospector frequently telling them that they were "nearly there," always speaking of "the next hill" being the place. Wheeler, who tells the story, is a man 27 years of age, with experience in traveling on the desert and in estimating distances. He estimated the distance traveled from the river to the mining claim at 10 miles. They started upon the return trip at about 9:15 a. m. and at 10:30 arrived at the place where they had eaten breakfast, which, Wheeler says, was about 6 miles from the river. Here Wheeler, who had a can of tomatoes, divided it; each taking one-fourth. Wheeler then left with the others what water he had and started in advance of them for the river. When he arrived at the river, at about noon, his mouth was parched; he was feeling hot, and walked into the river to cool off. The thermometer at Watson's tent near the river registered 131 degrees Fahrenheit. The accuracy of the thermometer was questionable according to Wheeler's testimony. In the river Wheeler washed his socks and the temperature was so high that the wet socks, when laid upon a rock, dried almost instantly. He then returned to the desert to look for his companions. About three-quarters of a mile from the river he met Vincent "hollering for water." Vincent informed Wheeler that he had given the others what water he had left and said they had

Appeal from Third District

enough to last until 2 o'clock. After taking Vincent to the river, Wheeler returned for Richards and Watson, at about 1:45 p. m. About three-quarters of a mile from the river he found Richards apparently unconscious. He poured water on him and worked his arms, but life was extinct. Wheeler then started into the desert to find Watson. He went 4 or 5 miles, and, upon returning, found Watson about 100 yards from the river. Watson had lain down to die. He was refreshed with water and taken to camp by Wheeler.

Richards, the insured, at the time the trip was undertaken, was a strong, robust, and healthy man 40 years of age.

While the discussion by counsel has assumed a wide range, the material and controlling issues are stated in these two of appellant's sixteen assignments of error:

"First. That the court erred in hearing said cause and in submitting the same to the consideration of the jury and in entering a judgment in favor of the plaintiff and against the defendant for the reason that neither the amended complaint nor the amendment to said amended complaint, taken singly or together, state facts sufficient to constitute a cause of action, said pleadings affirmatively showing on their face that the deceased, Joseph Heber Richards, died from a cause not covered by the terms of the policy of insurance which is the subject of this action.

"Second. That the court erred in not sustaining defendant's motion for a directed verdict in its favor because it is affirmatively shown by the entire record that the insured died from a disease known as sunstroke, and that his death was not the result of or caused by accidental means, and that said death did not result from bodily injuries effected directly, exclusively, and independently of all other causes through accidental means, but that, on the contrary, the entire record shows that the cause of the insured's death was a disease and not an accident, and that the evidence is insufficient in that it shows affirmatively and without dispute that the deceased or insured intentionally and voluntarily subjected himself to an intense heat, calculated to produce sunstroke, with the knowledge and apprehension of the danger which he encountered."

The first question involved is whether the words "bodily injury" in the policy embrace sunstroke; in other words, is sunstroke a bodily injury and included within the policy?

With commendable frankness counsel for defendant says in his brief that sunstroke is included in the policy if it is a bodily injury.

Physicians who testified for defendant declared sunstroke to be a disease, and some of them said that all medical authorities pronounce it to be a disease which physicians usually call "thermic fever," a synonym for sunstroke. The medical books describe sunstroke as a disease and every standard encyclopedia does the same. Describing sunstroke, the Americana says that it is due to exposure to intense external heat.

"Such exposure may be to the direct or indirect rays of the tropical sun or to the excessive heat of an engine room. In either case heat and physical exertion combine to bring about the results. A high degree of humidity of the atmosphere is one of the most important features, since this hinders free evaporation from the body. Sunstroke is an old disease. Osler mentions that two instances are on record in the Bible and many of the ancients describe it very well, confounding the severer forms with apoplexy. Two main types are seen—heat exhaustion and heat stroke. Other terms for heat stroke are insolation, thermic fever, coup de soleil."

The Encyclopædia Britannica refers to sunstroke as the term applied to the effects produced upon the central nervous system, and through it upon other organs of the body, by exposure to the sun or other heated air, and pronounces sunstroke to be a disease.

In *Sinclair* v. *Maritime Pass. Ins. Co.*, 3 El. & El. 478, it is held that sunstroke is a disease proceeding from natural causes and not accidental. In the opinion it is said:.

" * * * The disease called sunstroke, although the name would at first seem to imply something of external violence, is, so far as we are informed, an inflammatory disease of the brain, brought on by exposure to the too intense heat of the sun's rays. It is a disease to which persons exposing themselves to the sun in a tropical climate are more or less liable, just as persons exposed to the other natural causes to which we have referred are liable to disastrous consequences therefrom."

In *Dozier* v. *F. & C. Co. of N. Y.* (C. C.) 46 Fed. 446, 13 L. R. A. 114, the insurance was against bodily injuries sustained from external, violent and accidental means and did not cover disease or bodily infirmity. It was alleged in the petition or complaint that the assured, while in the discharge of his ordinary vocation, without any voluntary exposure on his part, came to his death by sunstroke or heat prostration.

The question determined was whether or not death resulted from sunstroke came within the injuries insured against. Based largely upon the Sinclair Case, it was held that a disease produced by a known cause cannot be considered as accidental; that sunstroke, or ''heat prostration'' is properly classified among diseases and therefore expressly excepted from the operation of the policy. The court said:

> "The common notion that sunstroke, or 'heat prostration,' as it is termed in the petition, comes like a stroke of lightning from a piercing ray of the sun, is utterly at fault."

Following the Sinclair and Dozier Cases are *Semancik* v. *Cont. Casualty Co.*, 56 Pa. Super. Ct. 392; *Cont. Casualty Co.* v. *Pittman*, 145 Ga. 641, 89 S. E. 716. In each of these four cases the insurance was against loss by bodily injury effected by accidental means and substantially in the language of the policy on which this suit is based.

While a formidable array of authorities hold sunstroke to be a disease and therefore not embraced within the words ''bodily injury,'' it is, nevertheless, not deniable that when considered in its popular sense sunstroke is a bodily injury and an accident. Thus, it is said in *Bryant* v. *Cont. Casualty Co.*, 107 Tex. 591, 182 S. W. 674, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517:

> "There have been certain decisions which announce that sunstroke is a disease. * * * But whatever it may be technically, it is not regarded as a disease in the popular mind. In the common understanding it is accounted a kind of violent personal injury, from the very idea of sudden external force carried by the word."

In *Gallagher* v. *Fidelity & Casualty Co.*, 163 App. Div. 556, 148 N. Y. Supp. 1016, affirmed in 221 N. Y. 664, 117 N. E. 1067, it is said:

> "While it may be conceded that sunstroke, freezing, and hydrophobia are diseases rather than accidents, the popular idea is not so."

In *Cont. Casualty Co.* v. *Clark* (Okl.) 173 Pac. 453, L. R. A. 1918F, 1007, it is said that sunstroke ''is not regarded as a disease in the popular mind.''

Now, in what sense is ''bodily injuries'' used in this policy? The answer depends on whether sunstroke is to be used in its

technical or pathological sense or whether the popular meaning is intended. The great mass of men with whom insurance companies· deal, and to whom they sell accident insurance, doubtless never regard sunstroke as a disease but do regard it as they do a stroke of lightning. They think and speak of sunstroke as an accident and as a bodily injury, never as sickness. All this is well known by the officials of insurance companies. "The terms used in an accident insurance policy should be understood in their plain, ordinary and popular sense rather than in philosophical or scientific sense." 1 C. J. p. 418. We may here apply what was said in *Lewis* v. *Ocean A. & G. Corp., Ltd., of London,* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129:

" * * * Our point of view in fixing the meaning of this contract must not be that of the scientist. It must be that of the average man. [Citing cases.] Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts."

In *Salt Lake City et al.* v. *Salt Lake City W. & E. P. Co. et al.,* 54 Utah, 10, 174 Pac. 1134, it is said that there is only one way to ascertain the effect and meaning of an author's language, and that is by considering the language in the light of the subject-matter and giving the words their usual and ordinary meaning and effect.

Referring to the words "bodily injury," appellant's counsel aptly says in his brief:

"The parties to the contract of insurance are conclusively presumed to have intended the term as it is ordinarily understood by the average man."

Applying this rule to this policy, it is clearly manifest that sunstroke is covered by the words "bodily injuries by accidental means." It is difficult to escape this conclusion unless the popular conception of the words "sunstroke" is to be considered only when the buyers procure insurance, and a different and technical conception of the same word is to be invoked when the insurance company seeks to escape liability.

The rule of applying the popular meaning to words found in insurance policies is doubly strengthened when the additional rule is invoked that insurance policies should be construed liberally in favor of the insured and their    . 2 beneficiaries so as to promote and not defeat the purpose of insurance. In this connection we call attention to the workmen's compensation cases on the subject of sunstroke, which offer a striking analogy to the case at bar.

The English Workmen's Compensation Law provides that compensation is granted to employees who "sustain personal injuries by accident," with the further provision that the accident must grow out of and be in the course of the employment. "Personal injuries by accident," and "bodily injuries by accidental means," cannot be differentiated without resorting to subtle and refined distinctions. If injury or death by sunstroke is within the purview of Workmen's Compensation Acts, why is it not covered by an insurance policy that insures against loss resulting from bodily injuries by accidental means?

In *Morgan v. S. S. Zenaida*, 25 T. L. R. 446, C. A., a finding that the applicant for compensation had suffered "personal injury by accident" was upheld, the facts being that the applicant, a seaman, was ordered to go over the side to paint the vessel when lying off the coast of Mexico. The heat was excessive and he sustained a sunstroke, the result being probable permanent injury to his health.

Pennsylvania, Utah, and other states have copied the English term "personal injury by accident," in their Workmen's Compensation Acts.

In *Lane v. Horn & Hardart Baking Co.*, 261 Pa. 329, 104 Atl. 615, sunstroke is held to be a "personal injury by accident."

The court quotes with approval from the report of the commissioner:

"The term 'personal injury' in our act is confined to injuries of accidental origin and such diseases as naturally result therefrom, and must be held to include any form of bodily harm or incapacity [accidentally] caused by [either] external violence or physical force. * * * A stroke by lightning, a stroke from the direct

rays of the sun, a heat stroke, or heat prostration, are untoward, unexpected mishaps and accidental injuries within the meaning of the act."

During the course of its opinion, in which the leading English cases are cited, the court says:

"The learned commissioner is not without authority in holding heat prostration, under circumstances such as those at bar, to fall within the meaning of the word 'accident' as that term is employed in modern compensation legislation; and, we may add, as it is used in the law of insurance."

Appellant's counsel further argues that the policy does not insure against accidental death, and that unless the injury or death was caused by accidental means the company is not liable. This argument is fortified by many authorities clearly distinguishing between accidental death and death by accidental means. The policy upon which this suit is predicated does not insure against accidental death. Its language is that the insurance is against loss from bodily injuries effected through accidental means. Now, what is meant by "accidental means"? Is sunstroke, like lightning, itself an accidental means or cause? The question is answered in the negative by all courts that treat sunstroke as a disease when the word "sunstroke" is used in or in connection with an accident insurance policy, but the trend of judicial opinion is not now in accord with the doctrine of such cases.

In *Bryant* v. *Cont. Casualty Co.*, 107 Tex. 591, 182 S. W. 673, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517, reversing the same case (Tex. Civ. App.) 145 S. W. 636, suit was brought by the beneficiary on a policy in which the insurance was against death by sunstroke resulting from external, violent, and accidental means independently of all other causes. Perry, the insured, suffered a sunstroke on an unusually warm afternoon in August while walking upon the streets of Houston in the ordinary course of his occupation as a collector of accounts and died from the sunstroke the day following. Discussing the means of the injury, it is said by the court:

"The question might well be rested at this place, though the exposure to which the assured subjected himself be considered as

'the means' of his injury. It is a mistake, however, to indulge that assumption. Exposure to the heat is the cause of a sunstroke only in the sense that exposure to any kind of external force furnishes the occasion of an injury as the result of its operation. In cases arising under accident insurance policies, where possible negligence on the part of the assured does not affect the question of liability, the efficient cause of a sunstroke, the vis major which inflicts the injury, is necessarily the excessive heat; and it must, therefore, be deemed 'the means' of the injury. If it be solar heat, it is not caused, and, when operating naturally, is not controlled by human agency; and under such circumstances it is impossible to associate with it the idea of its 'voluntary employment,' or to regard as not an accident an injury from it when suffered as here shown, in the sense that under certain conditions, as declared in the rule above noted, an injury resulting from a means voluntarily employed will not be so deemed.

"A sunstroke caused by the sun's rays, happening under the circumstances found in this case, is in our opinion an accident; as clearly so as is a lightning stroke. *Hutchcraft's Executor* v. *Travelers' Insurance Company*, 87 Ky. 300 [8 S. W. 570, 10 Ky. Law Rep. 260, 12 Am. St. Rep. 484]. It befell the assured without any human agency; and in the sudden, unexpected and unusual way in which he was affected by the heat as its cause, it had all the elements of an accident in its occurrence and result."

In *Higgins* v. *Midland Casualty Co.*, 281 Ill. 431, 118 N. E. 11, the reasoning in the Bryant Case is followed and approved. Higgins was a traffic policeman, and while, on a very hot day, he was performing his duties as such, in the usual and customary way, he was stricken by sunstroke. He was a man of temperate habits and good health. The question in dispute was whether sunstroke was the result of "accidental means." The court held that sunstroke was the result of accidental means.

In *Gallagher* v. *F. & C. Co.*, 163 App. Div. 556, 148 N. Y. S. 1016, affirmed in 221 N. Y. 664, 117 N. E. 1067, it was held that an insured, while intending to be in the sun, did not intend to produce a sunstroke; that the sunstroke was an accident, an event taking place without one's foresight or expectation, and hence was within the policy, being produced by accidental means which are agencies producing effects which are not their natural and probable consequences; "the requirement that the sunstroke be produced by accidental

means not requiring an accident to precede the sunstroke.''

In *Pack* v. *Prudential Casualty Co.*, 170 Ky. 47, 185 S. W. 496, L. R. A. 1916E, 955, the court states its conclusion to be that although the insured was voluntarily engaged in working in the sun the sunstroke was, nevertheless, an accident that he could not have reasonably foreseen or anticipated, although if it might have been reasonably expected that a sunstroke would follow as a natural and probable result of his work on this hot day the stroke was not an accident within the meaning of the policy.

In *Elsey* v. *Fidelity & C. Co.*, 187 Ind. 447, 120 N. E. 42, L. R. A. 1918F, 646, the insurance company contended, as it does here, that if the exposure to the heat of the sun was intentionally encountered in the ordinary performance of a person's usual duties of life or occupation, it is not accidental. In the course of the opinion it is said:

"The purpose of accident insurance is to protect the insured against accidents that occur while he is going about his business in the usual way, without any thought of being injured or killed, and when there is no probability, in the ordinary course of events, that he will suffer injury or death. The reason men secure accident insurance is to protect them from the unforeseen, unusual, and unexpected injury that might happen to them while pursuing the usual and ordinary routine of their daily vocation, or the doing of the things that men do in the common everyday affairs of life. We are of opinion that the better reasoning points out, and the weight of authority holds the true test to be, that if in the act which precedes the injury, though an intentional act, something unusual, unforeseen, and unexpected occurs which produces the injury, it is accidental; but, if in the act which precedes the injury something usual, foreseen, and expected occurs, which produces the injury, it is not accidentally affected."

In *Cont. Casualty Co.* v. *Clark*, supra, the insured, in company with another man, drove to the country, a distance of about six miles. It was hot and dusty. About the time of his return the insured suffered sunstroke and died. Holding that sunstroke was caused by accidental means, it is said in the course of the opinion:

" 'Accidental means,' as used in the policy, as we understand it, denoted 'accidental cause.' 'Means' and 'cause' could be and were intended to be interchangeably used in this policy, and so

that, if the sunstroke was suffered while the insured was engaged in his usual avocation or going about his affairs in an ordinary manner as any other person might have been under like or similar circumstances, and did not intentionally and voluntarily subject himself to an intense heat, calculated to produce sunstroke with the knowledge that it would probably occur, then we could say that the sunstroke was suffered from accidental means or accidental cause; that is to say, that 'sunstroke,' as used in the policy and as understood by the insured, was treated in the nature more of an accident than as a disease. While the decisions generally, with a few exceptions, hold that sunstroke is a disease, it is not regarded as a disease in the popular mind. In the common understanding of the insuring public it is accounted a kind of violent personal injury, from the very idea of sudden and external force carried by the word. If classed by medical authorities as technically a disease, to none but an expert medical mind would the provisions of this policy have carried this significance."

See, also, *Husbands* v. *Indiana Travelers' Acc. Ass'n* (Ind. App.) 130 N. E. 874.

If the sunstroke in the present case was not, in and of itself, an accidental means, as we think it was, it, nevertheless, according to the undisputed evidence, resulted from accidental cause. An "accidental means" is a means or a cause that is unexpected, unforeseen, and fortuitous; it is an accidental event, unexpected and unforeseeable, an occurrence that is unexpected and unforeseen.

The authorities generally hold that death or injury does not result from accident or accidental means within the terms of an accident insurance policy where the injury or death is the natural and probable result of the insured's voluntary act unaccompanied by anything unforeseen except the death or injury. The authorities cited by appellant in support of this proposition may be found in 7 A. L. R. 1131, 1132, and I. C. J. 427-429. However, it is a well-established exception to the above rule that where death or injury is not the natural and probable result of a voluntary and intentional act by the insured, or something unforeseen or unexpected or unusual occurs in the act which precedes the injury, then the injury is the result of accidental means. Supporting this proposition numerous authorities are cited by the annotator in 7 A. L. R. 1132, 1133. The leading case on the subject

is that of *United States* v. *Barry,* 131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60, in which it is held:

"The term 'accidental' was used in the policy in its ordinary popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected'; that, if a result is such as · follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

In *Western Commercial Travelers' Ass'n* v. *Smith,* 85 Fed. 401, 29 C. C. A. 223, 40 L. R. A. 653, Judge Sanborn gives a clear definition of "accidental means" as follows:

"The significance of this word 'accidental' is best perceived by a consideration of the relation of causes to their effects. The word is descriptive of means which produce effects which are not their natural and probable consequences. The natural consequence of means used in the consequence which ordinarily follows from their use—the result which may be reasonably anticipated from their use, and which ought to be expected. The probable consequence of the use of given means is the consequence which is more likely to follow from their use than it is to fail to follow. An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of these means, an effect which the actor did not intende to produce, and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means."

In *Lickleider* v. *Traveling Men's Ass'n,* 184 Iowa, 423, 166 N. W. 363, 168 N. W. 884, 3 A. L. R. 1295, it is said:

"There is, however, another alleged definition which has had a degree of judicial sanction, which ought not to be passed without notice. According to this definition, if correctly interpretated by

counsel for the defense, an injury happening to the insured through his own voluntary act is not an accident, nor is his hurt to be attributed to accidental means—a proposition which is wholly at variance with every statement of the true rule, as illustrated in the numerous authorities above cited.  It may be, and it is, true that, if the insured does a voluntary act, the natural, usual, and to be expected result of which is to bring injury upon himself, then a death so occurring is not an accident, in any sense of the word, legal or colloquial; and it is only when thus limited that the rule so stated has any proper application.  To illustrate:  A, may be foolhardy enough to believe that he can leap from a fourth-story window with safety, and, trying it, is killed.  B., desiring to descend from the same floor, climbs out upon a fire escape, which collapses, and he falls to his death.  In no proper sense of the word is A.'s death accidental or caused by accidental means, nor can any reasonable person deny that B.'s death is accidental and produced by accidental means, yet neither would have happened but for the voluntary act of the deceased.  To say that the deceased, in the case at bar, did just what he attempted and intended to do, that is, he attempted to remove and did remove the tire from the wheel, and therefore there was no accident or accidental means producing his injury, is to beg the whole question and to ignore the well-established meaning of words.

"'Accident assurance companies do business mostly with the common people, and the term "accidental" as used in these policies, should be defined according to the ordinary and usual understanding of its signification." [See *Young* v. *Ry. Mail Ass'n*, 126 Mo. App. 341.]

"It makes no difference whether the injured man or some other person voluntarily sets in motion the first of a series of events which, in connected line of causation, results in his injury or death.  If, to use the language I have quoted, the resulting injury and violence to him 'unexpectedly took place,' or was 'an unexpected result from a known cause,' or was produced 'without design or intention,' or was 'an unusual and unexpected result attending the performance of a usual or necessary act,' or was an 'event happening without the concurrence of the will of the person by whose agency it was caused,' or if it was 'caused or produced without design,' it falls directly within the letter and spirit of the definition which has been placed upon the words by the most competent lexicographers, as well as by our most eminent jurists who have given attention thereto."

Even in *Sinclair* v. *Maritime Pass. Ins. Co.*, supra, in which it was held that death resulting from exposure to the heat on board ship was not covered by a policy insuring against "in-

jury caused by accident,'' there is a significant suggestion that if the exposure itself had been due to accidental circumstances the risk might have been covered.

An illustrative case is that of *McCarty* v. *Travelers' Ins. Co.,* 15 Fed. Cas. 1254, No. 8682, 8 Bliss, 362, a suit on an accident policy where the death was alleged to have occurred by reason of the rupture of a blood vessel sustained while exercising with Indian clubs. It was held that if the deceased used the clubs for exercise in an ordinary way and without interference of any unusual circumstances, the means of injury would not be accidental, but if anything unforeseen occurred, such as one of the clubs striking a stove in the room where the deceased was exercising and that thereby there was occasioned a sudden and violent movement of his body from its ordinary position in such exercise, then it would be an injury effectuated by accidental means.

Were we to accept the technically fine, distinctions drawn by many of the courts, and eliminate the conception of sunstroke being in and of itself an accident, or as itself constituting accidental means, the question would still remain whether there was anything unexpected, unintended, unforeseen, or miscalculated in the events leading up to the sunstroke which produced the death of the insured. If there were such unforeseen, unusual, unintended occurrences, they became the accidental means that finally resulted in the accidental death of the insured. *Hastings* v. *Travelers' Ins. Co.* (C. C.) 190 Fed. 261. The evidence is uncontradicted that Watson, the prospector, expected his horses would arrive during the night; that they did not come as expected and as he had said they would; and that if the horses had arrived the parties would have ridden the horses as intended. It is undisputed that the parties started at about 3:30 o'clock in the morning with the express purpose of going to the mine, inspecting it, and returning before they would encounter the heat of the day. It is undisputed that Watson either misrepresented or miscalculated the distance, and that instead of being six miles the mining prospect was ten miles from the river. This

constituted an event that was accidental and that was     4
unexpected and unforeseen by the insured or by either
of those who accompanied him.   The evidence shows that the
parties took sufficient water for a trip six miles and return,
but not enough for the unexpected additional four miles and
return; that with ample water, which could and presumably
would have been taken had the true distance been known,
Richard's life would not have been in danger.   The evidence
is that in that climate and locality the atmospheric humidity
is not excessive and that sunstroke is there a rare occurrence.
Dr. Bower, a witness for appellant, testified that ''sunstroke
is rare in this high, dry mountain country.''   He said:

"I don't think we have had over five or six in the 35 years I have
been here.   The presence of moisture increases the probabilities of
sunstroke.   The atmosphere becomes dryer as you get higher up and
the possibility of sunstroke lessens."

The testimony of Dr. Bower is in full accord with what is
common knowledge.   Every one knows that those who are lost
in the desert in this latitude seldom perish from heat.   It is
from starvation, and especially from thirst, that the lost wan-
derer suffers indescribable agony that often ends in death.

It is argued by appellant that Richards intentionally
brought this danger upon himself; that he must have known
that he was extremely culpable in doing what he did and that
his voluntary exposure to intense heat of the Arizona desert
was no mere act of negligence but directly produced his
death.   In our opinion these assertions find no support or jus-
tification whatever in the evidence.   Though the heat was un-
doubtedly intense, neither Richards nor any of his compan-
ions anticipated or had any reason to anticipate any danger
whatever from sunstroke.   It is beyond all cavil that if the
distance had been only six miles, as represented by Watson,
the trip could and would have been made without either dan-
ger or much inconvenience.   It would have been made with
complete safety before the hottest part of the day.   When the
parties started on their trip it is apparent that no reason ex-
isted for apprehending danger.

Nor was danger to be expected as a natural and probable

result when the return trip was commenced. Although complaining of not feeling well, Richards was at that time perspiring freely, which was evidence that even then he had no cause to fear or expect danger from sunstroke. In fact, the evidence indicates that it was not until a moment before his death that he was conscious of any danger that threatened him. Watson, in the proof of loss offered by plaintiff, testified as to the sunstroke as follows:

"When returning from the mine, the first real intimation I had was that he stopped and pointed at something on the ground, and then sank down as though he had been shot through the brain. * * * He remarked, 'Dad, I stayed back to help you along, and now you are helping me,' and he said, 'I would hate to fall down or have to give up here.'"

Watson was an old man over 70 years of age. He walked slowly, and the deceased had remained with him while the others hurried on.

But it is said that when Richards reached the six-mile point he should and could have returned. It is true, as stated by appellant's counsel, that when the parties arrived at the six-mile point they could have returned to their camp on the Arizona bank of the Colorado river. Possibly if the parties had doubted the oft-repeated statements of Watson that they were almost at their destination, they would have refused to proceed. But Richards was pursuing his usual occupation. He was under no duty to stop at the six-mile point and weigh the probabilities as to whether there might be danger in proceeding farther. He was following his vocation and had a right to proceed.

In *Interstate Business Men's Acc. Ass'n* v. *Lester*, 257 Fed. 225, 168 C. C. A. 309, it is said:

"Men holding accident policies do not have to enter into nice calculations to determine whether they are stepping into a field of greatly increased hazard or not in following their vocations. They may go about their course of life, knowing that they are protected by their insurance, unless they enter a hazard which is expressly excepted from their policy."

In *State Life Ins. Co.* v. *Allison* (C. C. A.) 269 Fed. 93, the court says:

"Experience convincingly teaches that the hazards incident to

many * * * employments other than war are such that it is to be expected that some of those engaged therein will be injured or killed. If an accident policy contains no provision excepting such hazards and by chance, without the insured's design, consent, or co-operation, he is injured or killed as a result of a hazard incident to his occupation, his injury or death properly may be said to have caused by accidental means."

Possibly greater care might have been exercised by Richards and his companions. Possibly all were negligent in not taking more water and in not adopting some additional precautionary measures. But negligence is not here involved. Under this policy it is not a defense which the appellant may invoke.

Neither is "voluntary exposure to danger" a defense. The policy does not contain such a provision.

Unless the deceased intended to produce the very result which occurred, the element of danger is both unimportant and immaterial, because, as said in *Interstate Business Men's Acc. Ass'n* v. *Lester,* supra:

"Persons protected by accident insurance may incur consciously hazards which may result in their injury or death without forfeiting the insurance, unless the policy expressly excepts the hazards."

While we have referred to negligence and voluntary exposure to unnecessary danger as not being invocable defenses in this case, it should not be understood that we think the evidence would in the least degree establish, or even tend to establish, either negligence or voluntary and conscious exposure to danger if those were among the inhibitions of the policy.

In speaking of sunstroke as involved in the present case, we have reference to what some writers have called true sunstroke; that is, sunstroke from the direct rays of the sun.

Our conclusions are that the term "bodily injuries" within the meaning of the policy embraces sunstroke or a heat stroke from the direct rays of the sun; that the sunstroke was itself in this case an accidental cause or means resulting in the death of the insured; that the combination of unexpected circumstances, and particularly the miscalculation of the distance from the river to the mining claim, were accidental

means unexpectedly producing an unforeseen and unforeseeable, unusual, and not to be expected result, and that on the admitted facts, the submittal of the issues to the jury was unnecessary; plaintiff being entitled to an instruction directing a verdict in her favor. Having arrived at the conclusions stated, it is not necessary to consider the alleged errors in the instructions and in the procedure on the trial.

We think the judgment right, and it is affirmed.

CORFMAN, C. J., and GIDEON and THURMAN, JJ., concur.

FRICK, J. I concur both in the reasoning and in the conclusions of Mr. Justice WEBER. I have less hesitation in doing so for the reason that sunstroke, as commonly understood by the layman, is not a disease. The defendant was as well aware of that fact as any one. If, therefore, it was intended that sunstroke should be excluded as one of the hazards covered by the policy, the defendant should have said so in the policy itself. Not having done that, and having thus led the ordinary layman to assume that the term sunstroke was to receive its popular rather than its technical meaning, and having had the advantage of selling its policies to those who so understood the term, it should not now be permitted to insist upon the technical and restricted meaning of the term, at least not in a case like the one at bar. While if in a few words it had been stated in the policy that sunstroke was to be considered as a disease and not as an accident no one could have been misled, yet it might well be that if the exception had been thus plainly stated in the policy many of those who bought the policy in the belief that it covered sunstroke might have declined to enter into such a contract of insurance. The defendant having thus had the advantage of the popular understanding in selling insurance, it should, in my judgment, also bear the consequences of that understanding.