14452·

## GOETHE v. NEW YORK LIFE INSURANCE COMPANY

(190 S. E., 451)

June, 1936.

*Messrs. Thomas, Lumpkin & Cain* and *Charles E. Perry, Jr.,* for appellant,

*Mr. H. Klugh Purdy,* for respondent,

March 11, 1937.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The defendant, New York Life Insurance Company, issued its policy to one Thomas A. Goethe, on February 4, 1927, insuring his life in the sum of $2,000.00. the insurance contract carried, also, a provision known as a double indemnity, which clause provided that a further sum of $2,-000.00 would be paid by the defendent "upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental means, and occurred within ninety days after such injury." Another portion of the double indemnity provision, germane to this inquiry, contains this language: "Double indemnity shall not be payable if the insured's death resulted * * * directly or indirectly from infirmity of mind or body, from illness or disease. * * *"

While this insurance was in force Goethe died on April 9, 1934, and this action was then brought on the contract of insurance by the plaintiff as administratrix of his estate, upon the theory and on the allegation that his death was the result of accidental bodily injury, within the scope and meaning of the contract. It is alleged in the complaint that the sum of $2,000.00, the amount of the life insurance, has been

paid by the defendant, but that payment of the double indemnity in the sum of $2,000.00 has been refused; and judgment is demanded for this amount, with interest. The defendant denies liability and resists payment of the insurance, alleging that Goethe's death resulted from natural causes, disease, and that for death so resulting there is no liability under the terms of the policy.

The trial resulted in a verdict for the plaintiff in the full amount, and the defendant has appealed to this Court, assigning error based upon the refusal of the trial Judge to grant its motions for a nonsuit and a directed verdict.

The first position taken by the appellant is that the only reasonable inference to be drawn from the evidence is that the insured's death was the result of heart disease, either angina pectoris or coronary thrombosis; and therefore that the double indemnity is not recoverable. This and all other issues presented make necessary an examination and statement of the evidence.

In substance, the undisputed evidence is that the insured was a man between 40 and 50 years of age, who operated a small mercantile establishment and also engaged in farming operations. On the morning of his death, April 9, 1934, he arose at his usual hour, and after breakfast he walked over his farm, returning to his store about 9 o'clock, where he remained until about 11 o'clock. At that time he received a message from a field hand that it was necessary to burn certain new ground in order to prepare the land for plowing. He thereupon went to the field, and together with two young Negro field hands commenced the operation of burning off the new ground, preparatory to plowing. They were so engaged for about 40 minutes, and had completed burning over the land which he desired to have plowed, when the wind arose and spread the fire from a burning stump into an adjoining pasture, which was covered with broom straw about 4 feet high. In order to protect the pasture, the insured and his two Negro helpers endeavored to extinguish

the fire. They fought it violently and vigorously, attempting to beat it down with pine tops, described as being about 6 feet in length, and succeeded in extinguishing the pasture fire in about 20 minutes, but only after it had burned over an acre of land.

The two field hands testified that after this exertion they were tired, hot, and perspiring, and one of them said that he had never fought a fire as hard as he fought this one. But neither of them suffered any physical indisposition as the result of the work. Immediately after the fire was subdued, the insured lay down in the shade of a tree, placed his hand over his chest, and made the statement that he was unable to get back to his house, a half mile away, and requested one of the Negroes to go to the house and ask his wife to come for him in the automobile. He gave every evidence of complete exhaustion, appeared to be suffering severe pain, breathed with difficulty, and was perspiring profusely. His wife reached him in about ten minutes, and he told her that he was very sick, and wished to be taken to the house. Mrs. Goethe said that he was very pale, that his hand was across his chest, but that he got into the automobile without assistance, and when he reached home he got out unaided and went to the house, at which time he was still hot and perspiring. He went into the living room and sat upon the floor for about 20 minutes, with his back supported by a chair. During this time, at his request, he was given a dose of soda water. His wife suggested that she call the doctor, but he demurred, and stated that he would soon be all right, and within a few minutes he appeared to feel better. Upon leaving the living room, the insured went into his bedroom, where, with the assistance of his wife, he bathed, undressed, and went to bed. While still apparently very sick, he had recovered some of his normal color, and seemed to feel better. She stayed with him about ten minutes, when she was summoned to the store nearby; and, after being there about two minutes, she called back to a servant girl,

who was on the house porch, to ask the insured how he felt. This girl went to the bedroom door, and then ran back to the porch, urgently calling Mrs. Goethe to return as quickly as she could because there was something wrong with the insured. She returned at once, and found him in a dying condition. The insured's face had turned a dark purple color, and he was barely breathing. Mrs. Goethe promptly summoned a physician, but the insured expired before the doctor arrived.

As already indicated, our first inquiry has to do with whether or not there is in this record any testimony tending to show that the death of the insured was the result of injury from accidental means. The burden was doubtless upon the plaintiff to present evidence from which the jury could properly find that the death of the deceased resulted from injuries of the nature or kind against which the policy insured him. The plaintiff contends that the insured died from a heatstroke, as a consequence of the intense heat to which he was exposed, while fighting the unexpected fire which had invaded the pasture. The appellant vigorously argues that death resulted from heart disease, either angina pectoris or coronary thrombosis.

Physicians who testified for the defendant declared heatstroke or sunstroke—the two being analogous terms; one being caused from artificial heat, and the other from the direct rays of the sun—to be a disease.

Dr. C. P. Ryan, testifying for the plaintiff, gave it as his opinion that heatstroke is not a disease, but would come in the category of bodily injury, brought about through accident or by what might be called an unexpected event. Dr. Ryan testified that he had always known the insured, and had been his family physician for a period of nine years prior to his death. He said that Mr. Goethe came to his office one month prior to his death, and stated that a friend of his had recently been examined by a physician and was found to be suffering from some disease, and for this reason he himself

wished a physical examination. Thereupon he gave him the same type of examination as that required by the defendant insurance company when it sold him the policy; and, he stated, "I checked him from head to foot, heart, lungs, kidneys, and his blood pressure, and I found nothing wrong with him then."

In answer to a hypothetical question, containing the facts developed during the trial, embracing the condition and symptoms of the insured immediately prior to his death, this physician expressed it as his opinion that the most probable cause of death was heat exhaustion or heatstroke, and gave a medical explanation and definition of heatstroke.

When asked, on cross examination, if he thought that the heat generated from the burning broomstraw was sufficient to produce a heatstroke, he replied that it not only could, but that it did so happen in this case. Dr. Ryan also said that certain symptoms are common to many diseases, and that some of the symptoms shown by the deceased were common to some types of heart disease, and among these mentioned angina. He said that the disease known as angina pectoris is usually accompanied by pain in the chest; that the patient invariably places his hand upon his chest, loses color, and perspires profusely.

Dr. A. Ritter was called by the defendant, and gave it as his opinion, after hearing all of the testimony, that the symptoms shown by the deceased pointed almost conclusively either to angina pectoris or coronary thrombosis. He qualified this statement by stating that some of these symptoms would lead him to believe that the insured's death could have been due to heatstroke or sunstroke. This physcian had had actual experience with three or four cases of heatstroke, and stated that when the patients were brought to him they were either unconscious or became unconscious shortly afterwards, but that none died. When asked if in his opinion the heat to which Mr. Goethe was exposed by the pasture fire, or by the rays of the sun during the month

of April, were sufficient to produce or cause a heatstroke, he replied that he did not think it would so affect the average person, but with reference to the insured it would depend upon his attitude in fighting the fire, whether he was an ordinary fire fighter, or whether he went after it to get it out in a hurry.

Dr. J. Heyward Gibbes, a witness for the defendant, testified that he had never attended a patient in his practice suffering from heatstroke or sunstroke but, after listening to the testimony given at the trial, expressed the positive opinion that the insured did not die as the result of sunstroke or heatstroke, but that his death was caused either by angina pectoris or coronary thrombosis; that the symptoms definitely showed either the one or the other. We may note in passing that never once did the insured complain of pain, although excruciating unbearable pain is a typical symptom of angina pectoris.

The undisputed testimony is that the insured enjoyed excellent health for years prior to his death.

We think that more than one reasonable inference may be drawn from the testimony, which we have somewhat lengthily stated, as to the cause of death.

It is earnestly contended by the appellant that a heatstroke does not constitute a bodily injury; and that death so resulting is not effected through accidental means, and it is urged that the death of the insured, having resulted through his voluntary act, was not, therefore, effected through accidental means.

A consideration of this question has engaged the attention of the Courts in many jurisdictions. We may say at the outset that in our opinion heatstroke is included in the policy if it is bodily injury. In Couch on Insurance, § 1154, it is said: "A sunstroke, according to the apparently better reasoned authorities, if suffered unexpectedly, is within the protection of an accident policy insuring against bodily injuries sustained through accidental means, or by 'accident.'

This is especially true where the exposure was unexpected and unforeseen. And there is some authority to the effect that sunstroke suffered while engaged in one's usual daily duties is by 'accidental means,' although there was no circumstances showing unexpected exposure to the sun, at least if not reasonably to be expected under the circumstances, and although the exposure was not brought about by circumstances giving it the character of an accident. And the word 'sunstroke' may cover a stroke resulting from artificial heat as well as from the rays of the sun; at least in the absence of a special provision to the contrary."

That a heatstroke may result from artificial heat is amply supported by authority. *Continental Cas. Co. v. Johnson,* 74 Kan., 129, 85 P., 545, 6 L. R. A. (N. S.), 609, 118 Am. St. Rep., 308, 10 Ann. Cas., 851; *Mather v. London G. & Acci. Co.,* 125 Minn., 186, 145 N. W., 963.

Numerous other cases are cited in the note under this section in support of the various propositions of law stated therein. An examination of the authorities convinces us that, not only by the weight of authority, but also by the better reasoned cases, a sunstroke or heatstroke suffered by one unexpectedly is within the protection of an accident policy insuring against bodily injuries sustained through external violent, and accidental means.

The physicians who testified for the defendant, basing their opinions upon recognized medical textbooks, declared sunstroke to be a disease. Every standard encyclopedia also supports this view.

Describing sunstroke, the Americana says that it is due to exposure to intense external heat: "Such exposure may be to the direct or indirect rays of the tropical sun or to the excessive heat of an engine room. In either case heat and physical exertion combine to bring about the results. A high degree of humidity of the atmosphere is one of the most important features, since this hinders free evaporation from the body. Sunstroke is an old disease. Osler mentions that

two instances are on record in the Bible, and many of the ancients describe it very well, confounding the severer forms with apoplexy. Two main types are seen,—heat exhaustion and heat stroke. Other terms for heat stroke are insolation, thermic fever, coup de soleil."

The Encyclopedia Britannica refers to sunstroke as the term applied to the effects produced upon the central nervous system, and through it upon other organs of the body, by exposure to the sun or other heated air, and pronounces sunstroke to be a disease.

In *Sinclair v. Maritime Pass. Assur. Co.,* 3 El. & El., 478, 121 Eng. Reprint, 521, it is held that sunstroke is a disease proceeding from natural causes, and not accidental. In the opinion it is said: "The disease called sunstroke, although the name would at first seem to imply something of external violence, is, so far as we are informed, an inflammatory disease of the brain, brought on by exposure to the too intense heat of the sun's rays. It is a disease to which persons exposing themselves to the sun in a tropical climate are more or less liable, just as persons exposed to the other natural causes to which we have referred are liable to disastrous consequences therefrom."

In *Dozier v. Fidelity & Cas. Co.* (C. C.), 46 F., 446, 448, 13 L. R. A., 114, 22 L. R. A., 620, the insurance was against bodily injuries sustained from external, violent, and accidental means, and did not cover disease or bodily infirmity. It was alleged in the petition or complaint that the assured, while in the discharge of his ordinary vocation, without any voluntary exposure on his part, came to his death by sunstroke or heat prostration. The question determined was whether or not death resulting from sunstroke came within the injuries insured against. Based largely upon the *Sinclair case,* it was held that a disease produced by a known cause cannot be considered as accidental; that sunstroke, or "heat prostration," is properly classified among diseases, and therefore expressly excepted from the opera-

tion of the policy. That Court said: "The common notion that sunstroke, or 'heat prostration,' as it is termed in the petition, comes like a stroke of lightning from a piercing ray of the sun, is utterly at fault."

In *Richards v. Standard Acci. Ins. Co.*, 58 Utah, 622, 200 P., 1017, 1020, 17 A. L. R., 1183, which is one of the leading cases on the subject under discussion, and with the reasoning of which we are in thorough accord, it is said:

"Following the *Sinclair* and *Dozier cases* are *Semanick v. Continental Casualty Co.*, 56 Pa. Super., 392; *Continental Casualty Co. v. Pittman*, 145 Ga., 641, 89 S. E., 716. In each of these four cases the insurance was against loss by bodily injury effected by accidental means and substantially in the language of the policy on which this suit is based.

"While a formidable array of authorities hold sunstroke to be a disease and therefore not embraced within the words 'bodily injury,' it is, nevertheless, not deniable that when considered in its popular sense sunstroke is a bodily injury and an accident. Thus, it is said in *Bryant v. Continental Casualty Co.*, 107 Tex. [582], 591, L. R. A., 1916-E, 945, 182 S. W. [673], 674, Ann. Cas., 1918-A, 517: 'There have been certain decisions which announce that sunstroke is a disease. * * * But whatever it may be, technically, it is not regarded as a disease in the popular mind. In the common understanding it is accounted a kind of violent personal injury, from the very idea of sudden external force carried by the word.'

"In *Gallagher v. Fidelity & Cas. Co.*, 163 App. Div., 556, 148 N. Y. S., 1016, affirmed in 221 N. Y., 644, 117 N. E., 1067, it is said: 'While it may be conceded that sunstroke, freezing, and hydrophobia are diseases rather than accidents, the popular idea is not so.'

"In *Continental Casualty Co. v. Clark*, [70 Okl., 187], 173 P., 453, L. R. A., 1918-F, 1007, it is said that sunstroke 'is not regarded as a disease in the popular mind.'

"Now, in what sense is 'bodily injuries' used in this policy? The answer depends on whether sunstroke is to be used in its technical or pathological sense or whether the popular meaning is intended. The great mass of men with whom insurance companies deal, and to whom they sell accident insurance, doubtless never regard sunstroke as a disease, but do regard it as they do a stroke of lightning. They think and speak of sunstroke as an accident and as a bodily injury, never as sickness. All this is well known by the officials of insurance companies. 'The terms used in an accident insurance policy should be understood in their plain, ordinary and popular sense rather than in philosophical or scientific sense.' 1 C. J., p. 418. We may here apply what was said in *Lewis v. Ocean Acci. & Guarantee Corp.*, 224 N. Y., 18, 120 N. E., 56, 7 A. L. R. 1129: '* * * Our point of view in fixing the meaning of this contract must not be that of the scientist. It must be that of the average man. (Citing cases.) Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, and unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts.'

"In *Salt Lake City v. Salt Lake City Water & Electrical Power Co.*, 54 Utah, 10, 174 P., 1134, it is said that there is only one way to ascertain the effect and meaning of an author's language, and that is by considering the language in the light of the subject-matter and giving the words their usual and ordinary meaning and effect.

"Referring to the words 'bodily injury,' appellant's counsel aptly says in his brief: 'The parties to the contract of insurance are conclusively presumed to have intended the term as it is ordinarily understood by the average man.'

"Applying this rule to this policy, it is clearly manifest that sunstroke is covered by the words 'bodily injuries by accidental means.' It is difficult to escape this conclusion unless

the popular conception of the word 'sunstroke' is to be considered only when the buyers procure insurance, and a different and technical conception of the same word is to be invoked when the insurance company seeks to escape liability.

"The rule of applying the popular meaning to words found in insurance policies is doubly strengthened when the additional rule is invoked that insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purpose of insurance."

Counsel for the appellant argues that the contract does not insure against an accidental result, but that the injury or death must be brought about by accidental means, else the company is not liable. They cite several authorities which make this distinction. But we are in accord with the conclusion stated by Mr. Justice Cardozo in his dissenting opinion (*Landress v. Phœnix Mut. L. Ins. Co.*, 291 U. S., 491, 54 S. Ct., 461, 463, 78 L. Ed., 934, 90 A. L. R. 1382) that: "The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. 'Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident.' Halsbury, L. C., in *Brintons v. Turvey*, L. R. (1905) A. C., 230, 233 [2 Ann. Cas., 137]. Cf. *Lewis v. Ocean Acci. & G. Corp.*, 224 N. Y., 18, 21, 120 N. E., 56, 7 A. L. R., 1129; *Innes v. Kynoch* (1919), A. C., 765, 775 [9 B. R. C., 478— H. L.]. On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. *Mutual L. Ins. Co. v. Hurni Packing Co.*, 263 U. S., 167, 174, 44 S. Ct., 90, 68 L. Ed., 235 [238], 21 A. L. R., 102; *Stipcich v. Metropolitan L. Ins. Co.*, 277 U. S., 311, 322, 48 S. Ct., 512, 72 L.

Ed., 895 [900]. The proposed distinction will not survive the application of that test."

This action is based upon a policy which provides that the insurance is against loss from bodily injuries effected through violent, external, and accidental means. It is well settled that the words "accident" and "accidental" have never acquired any technical meaning in law, and, when used in an insurance contract, they are to be considered and construed according to the common speech and common usage of people generally. *Lickleider v. Traveling Men's Asso.,* 184 Iowa, 423, 166 N. W., 363, 168 N. W., 884, 3 A. L. R., 1295.

What does a proper construction of the word "accidental" mean, and is heatstroke itself an accidental means or cause?

In *Bryant v. Continental Casualty Co.,* 107 Tex., 591, 182 S. W., 673, 677, L. R. A., 1916-E, 945, Ann. Cas., 1918-A, 517, reversing the same case (Tex. Civ. App.), 145 S. W., 636, suit was brought by the beneficiary on a policy in which the insurance was against death by sunstroke resulting from external, violent, and accidental means independently of all other causes. Perry, the insured, suffered a sunstroke on an unusually warm afternoon in August while walking upon the streets of Houston in the ordinary course of his occupation as a collector of accounts, and died from this sunstroke the day following. Discussing the means of the injury, it is said by the Court: "The question might well be rested at this place, though the exposure to which the assured subjected himself be considered as 'the means' of his injury. It is a mistake, however, to indulge that assumption. Exposure to the heat is the cause of a sunstroke only in the sense that exposure to any kind of external force furnishes the occasion of an injury as the result of its operation. In cases arising under accident insurance policies, where possible negligence on the part of the assured does not affect the question of liability, the efficient cause of a sunstroke, the *vis major* which inflicts the injury, is necessarily the ex-

cessive heat, and it must therefore be deemed 'the means' of the injury. If it be solar heat, it is not caused, and, when operating naturally, is not controlled, by human agency; and under such circumstances it is impossible to associate with it the idea of its 'voluntary employment,' or to regard as not an accident an injury from it when suffered as here shown, in the sense that under certain conditions, as declared in the rule above noted, an injury resulting from a means voluntarily employed will not be so deemed.

"A sunstroke caused by the sun's rays, happening under the circumstances found in this case, is in our opinion an accident; as clearly so as is a lightning stroke. *Hutchcraft's Ex'r. v. Travelers' Ins. Co.,* 87 Ky., 300, 8 S. W., 570, 10 Ky. Law. Rep., 260, 12 Am. St. Rep., 484. It befell the assured without any human agency; and in the sudden, unexpected and unusual way in which he was affected by the heat as its cause, it had all of the elements of an accident in its occurrence and result."

In *Higgins v. Midland Casualty Co.,* 281 Ill., 431, 118 N. E., 11, the reasoning in the *Bryan case* is followed and approved. Higgins was a traffic policeman, and while, on a very hot day, he was performing his duties as such, in the usual and customary way, he was stricken by sunstroke. He was a man of temperate habits and good health. The question in dispute was whether sunstroke was the result of "accidental means." The Court held that sunstroke was the result of accidental means.

In *Gallagher v. Fidelity & Cas. Co.,* 163 App. Div., 556, 148 N. Y. S., 1016, 1017, affirmed in 221 N. Y., 664, 117 N. E., 1067, it was held that an insured, while intending to be in the sun, did not intend to produce a sunstroke; that the sunstroke was an accident, an event taking place without one's foresight or expectation, and hence was within the policy, being produced by accidental means which are agencies producing effects which are not their natural and probable consequences; "the requirement that the sunstroke

be produced by accidental means not requiring an accident to precede the sunstroke."

In *Pack v. Prudential Casualty Co.*, 170 Ky., 47, L. R. A., 1916-E, 955, 185 S. W., 496, the Court states its conclusion to be that, although the insured was voluntarily engaged in working in the sun, the sunstroke was, nevertheless, an accident that he could not have reasonably foreseen or anticipated, although, if it might have been reasonably expected that a sunstroke would follow as a natural and probable result of his work on this hot day, the stroke was not an accident within the meaning of the policy.

In *Continental Casualty Co. v. Clark*, 70 Okl., 187, 173 P., 453, 454 L. R. A., 1918-F, 1007, the insured, in company with another man, drove to the country, a distance of about six miles. It was hot and dusty. About the time of his return the insured suffered sunstroke and died. Holding that sunstroke was caused by accidental means, it is said in the course of the opinion: " 'Accidental means,' as used in the policy, as we understand it, denoted 'accidental cause.' 'Means' and 'cause' could be and were intended to be interchangeably used in this policy, and so that, if the sunstroke was suffered while the insured was engaged in his usual avocation or going about his affairs in an ordinary manner as any other person might have been under like or similar circumstances, and did not intentionally and voluntarily subject himself to an intense heat, calculated to produce sunstroke with the knowledge that it would probably occur, then we could say that the sunstroke was suffered from accidental means or accidental cause; that is to say, that 'sunstroke,' as used in the policy and as understood by the insured, was treated in the nature more of an accident than as a disease. While the decisions generally, with a few exceptions, hold that sunstroke is a disease, it is not regarded as a disease in the popular mind. In the common understanding of the insuring public it is accounted a kind of violent personal injury, from the very idea of sudden and

external force carried by the word. If classed by medical authorities as technically a disease, to none but an expert medical mind would the provisions of this policy have carried this significance." See, also, *Husbands v. Indiana Travelers' Acci. Asso.* (Ind., App.) 130 N. E., 874.

The authorities generally hold that death or injury do not result from accident or accidental means within the terms of an accident insurance policy where the injury or death is the natural and probable result of the insured's voluntary act unaccompanied by anything unforeseen except the death or injury. The authorities cited by appellant in support of this proposition may be found in 7 A. L. R., 1131, 1132, and 1 C. J., 427-429. However, it is a well-established exception to the above rule that, where death or injury is not the natural and probable result of a voluntary and intentional act by the insured, or something unforeseen or unexpected or unusual occurs in the act which precedes the injury, then the injury is the result of accidental means. Supporting this proposition numerous authorities are cited by the annotator in 7 A. L. R., 1132, 1133. The leading case on the subject is that of *United States Mut. Acci. Asso. v. Barry,* 131 U. S., 100, 9 S. Ct., 755, 762, 33 L. Ed., 60, in which it is held: "The term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected'; that if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means." *Richards v. Standard Acci. Ins. Co.,* 58 Utah, 622, 200 P., 1017, 17 A. L. R., 1183. Also see *Western Commercial Travelers' Asso. v. Smith,* 85 F., 401, 29 C. C. A., 223, 56 U. S. App., 393, 40 L. R. A., 653.

In *Lickleider v. Iowa State Traveling Men's Asso.,* 184 Iowa, 423, 166 N. W., 363, 366, 168 N. W., 884, 3 A. L. R., 1295, it is said:

"There is, however, another alleged definition which has had a degree of judicial sanction which ought not to be passed without notice. According to this definition, if correctly interpreted by counsel for the defense, an injury happening to the insured through his own voluntary act is not an accident, nor is his hurt to be attributed to accidental means—a proposition which is wholly at variance with every statement of the true rule as illustrated in the numerous authorities above cited. It may be, and it is true, that if the insured does a voluntary act, the natural, usual, and to be expected result of which is to bring injury upon himself, then a death so occurring is not an accident in any sense of the word, legal or colloquial, and it is only when thus limited that the rule so stated has any proper application. To illustrate, A. may be foolhardy enough to believe that he can leap from a fourth story window with safety, and, trying it, is killed. B., desiring to descend from the same floor, climbs out upon a fire escape, which collapses, and he falls to his death. In no proper sense of the word is A.'s death accidental or caused by accidental means, nor can any reasonable person deny that B.'s death is accidental and produced by accidental means;—yet neither would have happended but for the voluntary act of the deceased. To say that the deceased in the case at bar did just what he attempted and intended to do—that is, he attempted to remove and did remove the tire from the wheel,—and therefore that was no accident or accidental means producing his injury, is to beg the whole question and to ignore the well-established meaning of words. * * *

" 'Accident insurance companies do business mostly with the common people, and the term 'accident' as used in these policies should be defined according to the ordinary and usual understanding of its signification.' [See *Young v. Rail-*

*way Mail Asso.,* 126 Mo. App. [325], 341, 103 S. W., 557.]

·"It makes no difference whether the injured man or some other person voluntarily sets in motion the first of a series of events which in connected line of causation results in his injury or death. If, to use the language I have quoted, the resulting injury and violence to him 'unexpectedly took place,' or was 'an unexpected result from a known cause,' or was produced 'without design or intention,' or was 'an unusual and unexpected result attending the performance of a usual or necessary act,' or was an 'event happening without the concurrence of the will of the person by whose agency it was caused,' or if it was 'caused or produced without design,' it falls directly within the letter and spirit of the definition which has been placed upon the words by the most competent lexicographers as well as by our most eminent jurists who have given attention thereto."

The rule clearly deducible from the overwhelming weight of authority is that, when injury or death follows or results from a voluntary act of the insured, and the act is one which is not manifestly dangerous, but which is ordinarily done or performed without serious consequences to the doer, such result is caused by accidental means. This is nowhere better stated than by Sanborn, J., in *Western Commercial Travelers' Asso. v. Smith,* 85 F., 401, 405, 29 C. C. A., 223, 56 U. S. App., 393, 40 L. R. A., 653, where he says: "An effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and * * * cannot be charged with the design of producing, * * * is produced by accidental means."

In our opinion, the heatstroke suffered by the insured in the case at bar was in and of itself an accidental means, but, if it was not, nevertheless it resulted from accidental means or an accidental cause, according to the undisputed evidence. The "accidental means" was the

sudden exposure to the heat arising from the unforeseen and unexpected fire which had spread to the broom grass in the pasture. It is manifest from what we have said, and from the cases which we have cited, that the injury was accidental. Under the undisputed facts, it is equally true that it was external and violent, and comes within the coverage of the double indemnity clause. The cases bearing upon the point are so numerous that we desist from any further attempt to mention them in greater detail. They are listed in the annotated notes appearing in 17 A. L. R., 1197, and Ann. Cas., 1918A, 523.

.Our conclusions are that the term "bodily injury" within the meaning of the policy embraces heatstroke, either from the direct rays of the sun or from artificial heat; that the heatstroke was itself, in the case at bar, an accidental cause or means, resulting in the death of the insured; that the combination of unexpected circumstances,—and we here have reference to the unexpected and unforeseen spread of the fire to the pasture,—were accidental means, unexpectedly produced, and bringing about an unexpected result. In our opinion, the trial Judge committed no error in submitting the entire case to the jury.

The exceptions are overruled, and the judgment below affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and BAKER concur.