[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10934

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 1, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-01319-CV-S

HOME INSURANCE COMPANY, as successor in interest to
the Home Indemnity Company,

                Plaintiff-Appellant,

COLONIAL COMPANIES, INC.,
COLONIAL LIFE & ACCIDENT INSURANCE COMPANY,

                Plaintiffs-Third Party-Plaintiffs-
                Cross-Claimants-Appellants,

versus

HARTFORD FIRE INSURANCE COMPANY,

                Defendant.

TWIN CITY FIRE INSURANCE COMPANY,

                Defendant-Cross-Defendant-
                Appellee,

HARTFORD CASUALTY INSURANCE COMPANY,

                Third-Party-Defendant-
                Appellee.

Appeals from the United States District Court
for the Middle District of Alabama

_____

**(February 1, 2006)**

Before EDMONDSON, Chief Judge, BLACK and FAY, Circuit Judges.

FAY, Circuit Judge:

This appeal involves a dispute over insurance coverage and finds the insured and one of its carriers suing another carrier for contribution toward the settlement of a claim by the insured's employee. Plaintiff-appellant, Home Insurance, seeks indemnity and reimbursement from defendant-appellee, Hartford Insurance, for the $2 million that it paid to settle the claims of H. Parker White against his employer Colonial Companies, Inc.  The district court granted summary judgment in favor of Hartford, holding that as a matter of law, Colonial had intended to cause White harm, and that no "occurrence" had taken place as defined in the policies. In addition, the district court dismissed Colonial's bad faith claim, holding that as a matter of law, Hartford owed no duty to defend Colonial because coverage did not exist. We affirm._____

**I. Statement of the Facts:**

Home Insurance Company (hereafter referred to as "Home") insured Colonial Life and Accident Insurance Company (hereafter referred to as "Colonial") under four comprehensive general liability policies that ran from January 1, 1990, until January 1, 1994. Twin City Fire Insurance Company, a subsidiary of Hartford Fire Insurance Company (hereafter referred to as "Hartford"), insured Colonial under an umbrella policy that ran from January 1, 1994, until January 1, 1997. These policies provided "bodily injury" coverage for those sums that the insured became legally obligated to pay, but only if such was caused by an "occurrence" during the policy period. The policies define "*bodily injury*" as "bodily injury, sickness or disease by a person, including mental anguish or death resulting from these symptoms." "*Occurrence*" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

## Parker White's Lawsuit

On October 19, 1995, Parker White (hereafter referred to as "White") sued Colonial for intentional fraud and breach of contract, alleging that Colonial had intentionally breached his contract by taking away certain accounts that had been previously assigned to him on a permanent basis. Colonial is in the business of

selling large group insurance coverage to employees of businesses through payroll deduction plans. The Colonial representative who establishes these accounts is entitled to a new business commission. In addition, the same representative is entitled to a renewal commission every time an outstanding policy is renewed by the insured. These commissions constituted the income of Colonial's sales representatives.

According to the record, White had been a Marketing Director for Colonial since 1980; however, in 1991, he agreed to take a demotion due to representations made by Colonial. White contends that Colonial induced him to continue working as a Sales Director, a demotion from Marketing Director, by promising him that he would be assigned permanently 174 employer accounts. During a meeting that took place in April, 1991, White claims that Bill Hinson, an employee of Colonial, represented that White's 174 accounts would be assigned to him on a permanent basis. White then received a memo from Hinson which indicated that it was Hinson's understanding that for a period of two years, Colonial's reassignment policy would not apply to the 174 accounts. Under this reassignment policy, if an account had not been worked on for 14 consecutive months, the account would "roll up" to the representative's Regional Director for reassignment to another representative.

4

Upon receiving the Hinson memo, White met with Regional Director, Billy Compton, to discuss this reassignment policy. Compton told White "not to worry about the fact that there would be no permanent assignment of the 174 accounts, because as long as he was Regional Director he would see that the accounts would be reassigned to White." However, in 1994, Don Fennell became the new Regional Director, and in February or March, 1994, according to Colonial's reassignment policy, 25 of White's accounts were "rolled up" to Fennell. Notwithstanding the alleged agreement between White and Colonial, Fennell did not reassign those 25 accounts back to White, instead he reassigned them to other representatives. Indeed, White testified that this pattern of reassignment continued until about half of his accounts were reassigned.

White alleges that Colonial "engaged in a series of willful, malicious, outrageous, deliberate and purposeful acts with the intention to inflict emotional distress upon him." White testified that not only did Colonial breach their contract with him by not permanently assigning him the 174 employer accounts, but they caused him severe emotional distress due to the loss of these economically profitable accounts. The medical records of White's internist, Dr. Paul Strong, substantiate his claims of bodily injury. He has been treated for a heart attack, depression, fatigue, alcoholism and impotence, all which were attributed to the

5

above described activities of Colonial. White also claimed that he has seen a psychologist for his depression and sleep problems.

Hartford's Conduct in Refusing to Settle

Recognizing that White was alleging claims that could possibly be covered by the policies it had issued to Colonial, Hartford undertook a defense in the White case. This was done under a "reservation of rights" letter. The case was assigned to Sue Jackson (hereafter referred to as "Jackson"), an experienced litigator. On November 17, 1995, Jackson hired Charles Stewart (hereafter referred to as "Stewart") to defend Colonial in the White case. On August 23, 1996, when Stewart took White's deposition, he described the "bodily injury"and "mental anguish" he had suffered due to the conduct of Colonial by virtue of its deliberate breach of the agreement and the intentional reassignment of a large number of his accounts. On November 13, 1997, Stewart submitted to Hartford his personal status report on the White case. Stewart noted that White was seeking both punitive and mental anguish damages, he further noted that the size of the award of damages is generally left largely to the discretion of the jury. Stewart stated that there was only a "50/50" chance of a defense verdict and it would be wise to try and settle this matter. He also listed several jury verdicts which had

6

been awarded in cases similar to the factual situation in the instant case. He stated that the case of <u>Lanier v. Old Republic</u>, which was tried before the same judge who was scheduled to hear the White case, ended with a $25 million verdict. He went on to list several other cases, all which received double-digit million dollar awards.

On December 5, 1997, Stewart advised Hartford that this would be a good time to settle this case. Hartford refused. On December 8, 1997, a conference call was made between Jackson, Stewart, John Weidman of Home, and Jackie Winston of Colonial. During this conference, Stewart suggested that in his opinion the case could be settled for an amount between one and two million dollars. Hartford still refused to contribute toward a settlement. On December 15, 1997, John Weidman concluded that this case needed to be settled, and offered to contribute up to $1 million on behalf of Home. Hartford continued to refuse to participate. Subsequently, Home offered White $500,000 to settle his claims. White denied this offer. On December 16, 1997, Home offered $750,000 to settle, and White again denied this offer.

On December 18, 1997, Stewart sent a letter to Hartford and Home forwarding copies of the medical testimony of Dr. Paul Strong. In Stewart's

opinion, Dr. Strong's testimony was extremely damaging to the defense's case. He again advised all concerned that the matter should be settled. Hartford maintained its position. Finally, on December 22, 1997, Hartford sent a different message to Colonial concerning settlement negotiations. Hartford stated that since it believed that White's claim was not based upon an "occurrence," as defined in the policies, Home and Colonial needed to supply the majority of the money for any settlement.

On December 29, 1997, White made his final settlement offer which would only be open until noon, December 31. White demanded $2 million, and either an additional $400,000, or a promise not to reassign any more of White's accounts. In the discussions with Home and Colonial, Hartford offered to contribute $250,000 toward a $2,400,000 settlement. This offer was conditioned upon Home and Colonial agreeing not to sue for additional contribution. Home refused to give such a release. Hartford refused to contribute toward a settlement. Ultimately, Colonial and Home contributed the funds necessary to conclude a settlement.

Consent to Magistrate Judge

On March 27, 2001, pursuant to the provisions of Title 28 U.S.C. 636(c)(1) and Fed.R.Civ.P. 73, the parties consented to the United States Magistrate Judge

8

conducting all proceedings in this case to final judgment.

## II. Standard of Review

We review rulings on motions for summary judgment *de novo*, applying the same legal standards used by the district court. See Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002).

## III. Analysis

The district court granted summary judgment in favor of Hartford, concluding that Home and Colonial failed to demonstrate that there exists a genuine issue of material fact regarding whether Colonial's acts constituted an "occurrence" under Hartford's policies. Alternatively, the lower court ruled that even if Colonial's acts did constitute an "occurrence," coverage fails to exist because of the intentional act exclusion. We agree with both findings.

Summary Judgment Standard

Under Fed.R.Civ.P. 56©) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings . . . which it believes demonstrate the absence of a genuine issue of material fact." Catrett, 477 U.S. at 323. If the moving party succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-moving party to establish that a genuine issue of fact material to the non-movant's case exists. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. With these principles of law in mind, we review the record.

Home and Colonial argue that the district court erred in granting summary judgment in favor of Hartford. They contend that according to South Carolina law,[1] a genuine issue of material fact is present as to whether Colonial's acts constitute "occurrences," as defined in the policies, and that Hartford failed to prove that Colonial intended a specific injury to White.

---

[1]The parties agree that South Carolina law controls the issue.

10

The  insurance policies at issue provide "bodily injury" coverage for those sums that the insured becomes legally obligated to pay, but only if such damages were caused by an "occurrence"which happened during the policy period. "*Occurrence*" is defined as "an accident," including continuous or repeated exposure to substantially the same general harmful conditions. In addition, the policies also contained an intentional act exclusion, "for bodily injury . . . expected or intended from the standpoint of the insured."

First, Home and Colonial contend that a genuine issue of material fact exists as to whether Colonial's acts are deemed an "occurrence." They argue that because the policies fail to define the term "accident," this court must look to other common understandings of that term.  Consequently, when a policy does not specifically define a term, "the term should be defined according to the usual understanding of the term's significance to the ordinary person." Manufacturers & Merchants Mut. Ins. Co. v. Harvey, 498 S.E.2d 222, 225 (S.C. Ct. App. 1998). Because the contracts at issue were created in South Carolina, we will look to the law of South Carolina for a definition of the term "accident."  The parties cite a plethora of cases to answer this question. However, we find the most persuasive authority to be Geothe v. New York Life Ins. Co., 190 S.E. 451 (S.C. 1937). In Geothe, the Supreme Court of South Carolina considered whether an insured had

11

died of accidental means when he collapsed from a heatstroke after attempting to put out a fire. The Supreme Court of South Carolina concluded the insured died of accidental means, holding:

> [W]hen injury or death follows or results from a voluntary act of the insured, and the act is one which is not manifestly dangerous, but which is ordinarily done or performed without serious consequences to the doer, such result is caused by accidental means. . . . "An effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and * * * cannot be charged with the design of producing, * * * is produced by accidental means."

Geothe, at 458 (citation omitted).

According to Geothe, "accident" or "accidental means," is an injury or death that does not ordinarily follow and "cannot be reasonably anticipated" from the act of the insured. Colonial contends that even though it may have intentionally breached its agreement with White, at no time did it "intend" to cause White any specific non-economic injuries. However, Home and Colonial have pointed to no issues of disputed fact regarding the intentional nature of Colonial's acts.

The facts as alleged and set forth in testimony clearly demonstrate that the conduct of Colonial was knowing and intentional. According to the record, White alleges that he was the target of Colonial's wrongful conduct, which he described as "willful, malicious, outrageous, deliberate and purposeful." According to

12

White's deposition, he had worked for Colonial for many years when, in March 1991 Colonial "manipulated" him into taking a demotion from his position as Marketing Director by fraudulently promising him 174 accounts on a permanent basis. Soon thereafter, White realized that Colonial had no intention of keeping its promise. The uncontradicted testimony shows that during extensive discussions following the reassignment of the first 25 accounts, Fennell made it clear that he had no intention of honoring the agreement. Thereafter, White's accounts continued to be reassigned. This caused a substantial reduction in his income and the resulting health problems.

Even though Colonial argues that it never intended to cause depression, alcoholism, and impotency to White, it has failed to present a scintilla of evidence going to prove that its conduct was not deliberate.

There is simply no dispute, based upon a review of the record, that Colonial's acts were intentional and done to harm. By their very nature these acts could not be called accidents, and thus could not constitute "occurrences" as defined in the policies. Accordingly, this court finds that Home and Colonial have failed to demonstrate that there exists a genuine issue of material fact regarding whether or not Colonial's acts constituted an "occurrence" under Hartford's policies.

This does not end our analysis, however, because under South Carolina law there are two prongs to an intentional act exclusion. The above discussion involves the first prong. We now turn to the second.

Home and Colonial argue that unless Hartford can demonstrate that Colonial specifically intended or expected its actions to cause White's alcoholism, depression, and impotency, the intentional act exclusion does not apply. Colonial and Home rely on State Farm Mut. Auto. Ins. Co. v. Moorer, 496 S.E.2d 875 (S.C. Ct. App. 1998), to assert that even if an insured intends to commit an act, the event is still an "occurrence," so long as the insured did not intend to cause the injury which resulted. This reliance is misplaced. In Vermont Mut. Ins. Co. v. Singleton, 446 S.E.2d 417, 419 (S.C. 1994), the South Carolina Supreme Court explains its two-prong test to determine the applicability of an intentional act exclusion in an insurance policy. The first prong of the test is met because, as set forth above, the acts complained of were clearly done knowingly and intentionally. The second prong of the test requires "an intentional result." In Singleton, the insured struck the victim in the head inflicting a serious eye injury. As it turns out, the facts revealed that this was done in self defense. The court held that because the intended result was self-defense and not an eye injury to the victim, the intentional act exclusion did not apply. In other words, the eye injury was accidental.

14

Hartford contends that the undisputed facts in this case prove that Colonial engaged in a series of intentional acts that were so inherently injurious, that non-economic injuries are inferred as a matter of law. It argues that Harvey, stands for this proposition. In Harvey, the court considered whether homeowners insurance policies provided coverage against claims that the insureds sexually abused their grandchildren. The policy in Harvey contained language identical to that of the policies *sub judice*.[2] The Court of Appeals of South Carolina concluded that because "[T]he sexual abuse of a child is so inherently injurious . . . [the] intent to harm the child will be inferred as a matter of law." Harvey, 498 S.E.2d at 226. In addition, the court held, "[T]he effect of sexual abuse is so integral to the act that the intent to do the act is interchangeable with the intent to cause the resulting injury." Id. at 227.

As illustrated in Harvey, the inquiry of the court is whether harm was intended, not whether a specific type of harm was intended. We find this case much closer to Harvey than to Singleton. As set forth in Harvey, some acts are so inherently injurious that the intent to harm will be inferred. No reasonably prudent person could fail to know that if you: (1) take away a substantial portion of a

---

[2]Harvey defined "occurrence" as an "accident," and the policies did not define the term "accident."

15

person's income, (2) demote them within the organization, (3) embarrass them with their co-workers, and (4) separate them from their established clients-----non-economic bodily injuries are most certainty going to result.

Although we find no case in South Carolina identical to ours, we believe the reasoning in Harvey controls. According to the record, White lost his managerial position at Colonial, had about half of his commission-based contracts reassigned resulting in a drastic reduction of income, was manipulated into taking a job demotion, was ridiculed in front of his colleagues, and was separated from his clients. We believe that it is outside the range of reasonableness to hold that a person who has suffered from such acts would only incur economic damages. Consequently, we find that Hartford has met both prongs of Singleton.[3]

"Personal Injury" Coverage

Home contends that the district court erred by failing to consider if White's claims of disparagement, humiliation and discrimination fall within the Hartford coverage for "Personal Injury." The Hartford policy covers "personal injury" which is defined to include; "publication of material that slanders or libels a

---

[3] As set forth above, and according to the law of South Carolina, because coverage did not exist under the Hartford policies, Colonial's bad faith claim has no merit.

16

person or organization or disparages a person's or organizations's goods, products or services" and "discrimination or humiliation that results in injury to the feelings or reputation of a natural person . . ." Home contends that White made claims of discrimination, humiliation and disparagement, and it was error for the district court to grant summary judgment in favor of Hartford without considering whether these claims are covered under the Hartford policy.

This argument is misplaced. Similar to the term "occurrence" in the Hartford policies, "personal injury" coverage applies only if the discrimination or humiliation was "not done intentionally by or at the direction of the insured . . . . " As set forth above, Colonial's actions toward White were knowingly and willfully committed. Therefore, any discrimination and humiliation Colonial caused White, would have been intentional, and thus outside the scope of "personal injury" coverage.

## Conclusion

Our review of the record convinces us that the district court was correct in granting summary judgment in favor of Hartford. There is no genuine issue of material fact regarding whether Colonial's acts constituted an "occurrence." The conduct in question was deliberate and intentional. In addition, Hartford has

established that both prongs of the intentional act exclusion as set forth in the law of South Carolina exist.

**AFFIRMED.**