<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-2451**

———————

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

        Plaintiff - Appellant,

   v.

JM SMITH CORPORATION; SMITH DRUG COMPANY, INC.,

        Defendants - Appellees.

———————

Appeal from the United States District Court for the District of South Carolina, at Spartanburg. Timothy M. Cain, District Judge. (7:12-cv-02824-TMC)

———————

Argued: January 28, 2015         Decided: March 13, 2015

———————

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Laura Anne Foggan, WILEY REIN LLP, Washington, D.C., for Appellant. George Antonios Tsougarakis, HUGHES, HUBBARD & REED LLP, New York, New York, for Appellees. **ON BRIEF:** Vollie Cleveland Bailey, IV, Robert Mason Barrett, Perry D. Boulier, HOLCOMBE BOMAR, PA, Spartanburg, South Carolina; Amera Z. Chowhan, Taylor K. Herman, HUGHES, HUBBARD & REED LLP, New York, New York, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Liberty Mutual appeals a district court ruling that it had a duty to defend its insured, the J M Smith Corporation, in a lawsuit brought by the state of West Virginia. Because the claims alleged in the West Virginia complaint create a possibility of coverage under the commercial general liability insurance policy that Liberty Mutual issued to J M Smith, we hold that Liberty Mutual has a duty to defend in the West Virginia case. We therefore affirm the judgment of the district court.

I.

J M Smith Corporation, along with its division Smith Drug Company, Inc. (collectively "J M Smith"), is a South Carolina wholesale pharmaceutical distributor. Since at least 2000, J M Smith has been insured by Liberty Mutual, a Wisconsin corporation, under annual commercial general liability (CGL) insurance policies. Among other things, these policies require Liberty Mutual to defend J M Smith against any suit seeking damages for bodily injury or property damage resulting from an "occurrence." J.A. 117. Under the policy, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." J.A. 130. "Accident," however, is left undefined.

2

On June 26, 2012, while J M Smith was insured by Liberty Mutual, the Attorney General of West Virginia sued J M Smith and twelve other wholesale drug distributors operating in the state. The complaint ("West Virginia Complaint") alleged that the drug distributors were contributing to a well-publicized prescription drug abuse epidemic in West Virginia by failing to identify, block, and report excessive drug orders. It identified "pill mills" -- physicians, pharmacists, and distributors of controlled substances who write and fill excessive prescriptions -- as responsible for increased abuses. The complaint also charged the drug distributors with "substantially contributing to" the epidemic by failing to maintain sufficient controls that would flag suspicious orders as required by West Virginia law, all while the distributors were on notice that the epidemic was a current and growing problem. West Virginia requested damages and equitable relief for the harms caused to the state by the companies' alleged contributions to the epidemic.

## A.

Given that the duty to defend depends on the possibility of insurance coverage arising from the specific allegations in the West Virginia complaint, we touch briefly on the details of the often overlapping eight counts West Virginia alleged against the thirteen defendants.

3

West Virginia first requested injunctive relief to prevent the defendants from "willfully and repeatedly" violating the Uniform Controlled Substances Act by failing, among other things, "to provide effective controls and procedures to guard against diversion of controlled substances in contravention of West Virginia law." J.A. 147 (W. Va. Complaint). West Virginia contended that failing to enjoin these violations would result in further losses "as the proximate result of the failure by the Defendants to monitor and to disclose suspicious orders of controlled substances." J.A. 147 (W. Va. Complaint).

Second, West Virginia requested damages for "Negligence and Violations of the West Virginia Uniform Controlled Substances Act." J.A. 148 (W. Va. Complaint). West Virginia alleged that the defendants were required to know their customer base and that, instead, they "willfully turned a blind eye towards the actual facts" of the drug abuse epidemic by "negligently act[ing] with others to violate West Virginia's drug laws" and "creat[e] conditions which contribute[d] to the violations of [these] laws." J.A. 149 (W. Va. Complaint).

Third, the state alleged that the defendants had repeatedly and willfully violated regulations promulgated under the Uniform West Virginia Controlled Substances Act requiring companies to obtain a controlled substance permit, maintain "effective controls and procedures to guard against theft and diversion of

4

controlled substances," and "operate a system to disclose []
suspicious orders of controlled substances" that deviate from
normal patterns in size or frequency. J.A. 150-151 (W. Va.
Complaint). West Virginia alleged that these violations
constituted unfair or deceptive acts or practices in violation
of the West Virginia Consumer Credit and Protection Act. J.A.
150-151 (W. Va. Complaint).

Count IV alleged that the defendants had "negligently,
recklessly, and/or intentionally" distributed controlled
substances known to be abused, "in such quantities and with such
frequency" that the defendants "knew or should have known" that
the prescriptions were not for "legitimate medical purposes."
J.A. 152 (W. Va. Complaint). By doing so with a "blind
indifference to the facts" of the prescription drug abuse
epidemic, the state charged the defendants with creating a
public nuisance.

The fifth count alleged that the defendants had been
unjustly enriched by earning money distributing drugs that were
not for legitimate medical purposes and by not having to pay the
costs incurred by the state as a result of prescription drug
abuses. J.A. 154 (W. Va. Complaint).

Count VI, entitled "Negligence," alleged a breach of the
"duty to exercise reasonable care in the marketing, promotion
and distribution of controlled substances," as well as

5

negligence in "failing to guard against third-party misconduct" in the form of "pill mills." J.A. 155 (W. Va. Complaint). The state claimed that the defendants breached their duty of "care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business," a business which posed "distinctive and significant dangers" that the defendants failed to acquire "special knowledge and special skills" to prevent or ameliorate. J.A. 156 (W. Va. Complaint). The complaint incorporated earlier allegations to demonstrate conduct that breached proper care. J.A. 155 (W. Va. Complaint).

Count VII requested a fund for medical monitoring to treat patients who had become prescription drug abusers as a result of the defendant's negligent and unlawful conduct.[*]

Finally, the eighth count alleged the defendants violated antitrust laws by conspiring with "pill mill" physicians and pharmacies to engage in "unfair and deceptive business practices to obtain [a] dominant market share" in West Virginia. J.A. 158-159. It alleged that by prescribing, filling and distributing controlled substances for illegitimate, non-medical uses, the

---

[*] After the district court decision, the West Virginia Attorney General filed an amended complaint which omitted this count. Amended Complaint, West Virginia v. Amerisourcebergen Drug Corp., No. 12-C-141 (W. Va. Cir. Ct. Jan. 2, 2014). However, as the presence or absence of this claim does not change our decision, this revision to the complaint is immaterial for the purposes of this appeal.

6

pill mills -- including defendants -- gained an unfair advantage over drug distributors that complied with regulations and established sufficient controls. J.A. 159 (W. Va. Complaint).

B.

On September 28, 2012, Liberty Mutual filed a complaint in South Carolina district court seeking a declaratory judgment that it had no duty to defend or indemnify J M Smith in the underlying West Virginia suit. Liberty Mutual moved for summary judgment on the ground that the West Virginia Complaint had not alleged an "occurrence" under the policy, and J M Smith likewise moved for summary judgment on the ground that the West Virginia complaint created the possibility of coverage under the policy to such an extent that Liberty Mutual had a duty to defend it. On September 24, 2013, the district court granted J M Smith's motion and denied that of Liberty Mutual.

In its opinion, the district court found that the West Virginia Complaint alleged acts of negligence on the part of J M Smith, not solely intentional violations. It further determined that the complaint alleged accidental violations because even though the claims were "arguably based upon intentional acts which resulted in violations of West Virginia law," the violations that resulted from those actions were not natural and probable consequences that would be reasonably anticipated. From this ruling Liberty Mutual now appeals.

7

Liberty Mutual contends on appeal that the West Virginia Complaint does not charge an "occurrence" within the meaning of J M Smith's CGL policy because the complaint alleges willful and intentional misconduct on the part of the insured that does not constitute an "accident." This seems to us to mischaracterize the complaint. One count (VI) sounds wholly in negligence, and the others generally describe a mix of negligence and intentionality. Liberty Mutual also contends on appeal that even if the West Virginia Complaint describes an "occurrence," it has not alleged bodily injury or property damage as required for coverage under the policy. However, as Liberty Mutual failed to raise this last argument properly below, we hold this contention waived.

As this case comes to us on diversity jurisdiction, the state law to be applied is determined by the choice-of-law rules of the state in which the federal district court sits -- in this case South Carolina. See Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex., 134 S. Ct. 568, 582 (2013) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 494-96 (1941)). In South Carolina, insurance contracts that are considered to be made within the state are subject to the laws of South Carolina. S.C. Code Ann. § 38-61-10. As the contract in this case was made by a South Carolina company, J M Smith, with

the South Carolina office of Liberty Mutual, we look to the laws of South Carolina to determine whether Liberty Mutual has a duty to defend the underlying action brought by West Virginia.

South Carolina law, like most states, imposes a broad duty to defend on insurers. Unlike the duty to indemnify that stems from actual liability, the duty to defend arises from the defendant's initial potential liability under the claims as alleged by the plaintiff. USAA Prop. & Cas. Ins. Co. v. Clegg, 661 S.E.2d 791, 796-97 (S.C. 2008). An insurer must defend its insured if there is a "possibility of coverage" under the policy, City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund, 677 S.E.2d 574, 578 (S.C. 2009), for even just one claim in the complaint. See Town of Duncan v. State Budget & Control Bd., Div. of Ins. Servs., 482 S.E.2d 768, 773-74 (S.C. 1997); Isle of Palms Pest Control Co. v. Monticello Ins. Co., 459 S.E.2d 318, 319 (S.C. Ct. App. 1994). We determine the likelihood of coverage by comparing the policy provisions with the facts alleged in the complaint, Clegg, 661 S.E.2d at 797, and any other relevant facts that are outside the complaint but known to the insurer, City of Hartsville, 677 S.E.2d at 578. Any ambiguities in the policy must be resolved in favor of finding coverage for the insured. Cook v. State Farm Auto. Ins. Co., 656 S.E.2d 784, 786 (S.C. Ct. App. 2008). In the above exercise, we look to the actual facts alleged in the complaint rather than

9

the labels affixed to the causes of action. See City of Hartsville, 677 S.E.2d at 578-79; State Farm Fire & Cas. Co. v. Barrett, 530 S.E.2d 132, 137 (S.C. Ct. App. 2000).

The instant policy, like many CGL policies, covers property damage or bodily injury caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not a defined term in the policy, but it has been well-defined in South Carolina law to mean "'[a]n effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and cannot be charged with the design of producing.'" Barrett, 530 S.E.2d at 136 (quoting Goethe v. New York Life Ins. Co., 190 S.E. 451, 458 (S.C. 1937)). In other words, accidents require that either the act or the injury resulting from the act be unintentional.

Turning to the counts alleged in the West Virginia Complaint, the distinction between intentional acts and intended consequences is instructive. The actual conduct alleged by the state of West Virginia is the drug distributors' failure to implement sufficient controls and systems to identify and alert regulatory authorities to suspicious prescription drug orders. In Count VI for negligence, the state alleges that these failures breached duties of care in marketing, promoting, and

10

distributing controlled substances as well as duties to guard against third-party misconduct such as that engaged in by "pill mills." This type of failure to take reasonable care and the resultant harm is the hallmark of negligence claims, and the count contains no demonstration of any intent to harm prescription drug users or, through them, the state.

Likewise in Count II, West Virginia discusses the standards of conduct in the industry and then claims that the defendants "wilfully [sic] turned a blind eye" to the facts and dangers of the drug epidemic in continuing to distribute their products negligently. Though paragraph 24 identifies "repeated violation of various provisions of the West Virginia Uniform Controlled Substances Act" that have "attended and promoted" the prescription drug epidemic, it does not tie these violations to the defendants. Rather, it effectively claims that such violations are part of the epidemic and the drug distributors, as part of the system, have not done enough to detect them. These claims do not amount to allegations of intentional harm.

Even in those counts that do not explicitly allege negligence, such as Count I for injunctive relief, the violations complained of by the West Virginia Attorney General are of laws and regulations that require controls and systems "to guard against theft and diversion" and "to disclose [] suspicious orders of controlled substances." J.A. 146. Even if

11

intentional acts, the violations described still amount to a failure to take reasonable care to prevent harm. The public nuisance claim effectively alleges that the defendants knew certain drugs were ones that were abused, and then continued to distribute them without effective controls -- once again, preventable but unintentional harm.

The cases pointed to by Liberty Mutual are helpful in drawing this line. The defendants in C.Y. Thomason Co. v. Lumbermens Mutual Casualty Co. began, as here, with legal but potentially negligent behavior: digging a ditch and piling a large amount of construction dirt next to a garage. 183 F.2d 729, 731 (4th Cir. 1950). Over the next year, however, the construction company watched as the dirt pile and ditch caused the garage to flood with mud and water -- and did nothing. Our court determined that this negligent behavior had, over time, effectively become intentional as the company witnessed direct harms from its "persistent[] and continuous[]" actions and failed to correct the situation to prevent further harm that resulted from "the normal consequences of the acts." C.Y. Thomason Co., 183 F.3d at 733.

However much Liberty Mutual might want to compare this case to that one, that is not what happened here. The West Virginia Complaint presses allegations against thirteen different defendants who may have been causing harm, but the chain of

12

causation is hardly direct. The complaint claims the defendants distributed drugs to pharmacies, which then filled physicians' prescriptions for patients, some of whom were or became abusers, resulting in harm to the abusers and, as a result, to the state. This is hardly the same as visible damage being openly visited as a direct result of the defendant's negligence. The number of defendants, all of which were distributing drugs and any one of which could have caused the alleged injuries, further blurs the connection between any intentional actions by the defendants and the alleged harm to the state. No defendant, and certainly not the insured, has been accused of providing prescription drugs to any person or entity knowing it was enabling an abuser. At most, there was a risk that some of the drugs might end up in an abuser's hands. C.Y. Thomason Co. and this case aptly demonstrate the subtle but clear line between intentional and accidental harm.

The simple fact that the alleged injurious action was repeated cannot on its own render the harm outside the policy's coverage. If that were the case, the CGL policy provision that allows an accident to include "continuous or repeated exposure to substantially the same general harmful conditions" would be meaningless. The possibility must be there, then, that an insured might engage in behavior repeatedly over a period of time that results in harm unbeknownst to it. Though the

13

defendants here may have known generally that prescription drug abuse was a problem in West Virginia, the complaint does not allege knowledge of harm directly attributable to any one distributor such that further violations must necessarily be done with intent to harm. Surely the attenuated chain of causation here creates at least a possibility of coverage in this case.

The other two cases relied on by Liberty Mutual are equally unavailing. One involved intentional sexual abuse of children, which South Carolina courts have held as a matter of law to be intentional harm. Mfrs. & Merchs. Mut. Ins. Co. v. Harvey, 498 S.E.2d 222, 226 (S.C. Ct. App. 1998). The other case involved an owner, operator, and distributor of gambling machines accused of violating laws intended to fight the gambling addiction problem in the state. Collins Holding Corp. v. Wausau Underwriters Ins. Co., 666 S.E.2d 897, 898-99 (S.C. 2008). Though the laws alleged to be violated by J M Smith and the other drug distributors likewise were enacted to prevent addiction, in this case to prescription drugs, the similarities end there. The complaint in Collins alleged that the defendant had been exceeding the maximum payout permitted by law and fraudulently inducing gamblers through advertising schemes. Collins, 666 S.E.2d at 899. The whole complaint charged the defendant with the purpose and intent to get gamblers hooked and, as a result, harmed.

14

By contrast, the defendants here were engaged in the lawful activity of providing prescription drugs to pharmacies. They may not have been sufficiently careful about whose hands the drugs eventually reached, but that does not preclude finding accidental injury. We cannot forecast how the case will conclude, but it is at least possible that the state court will find that the defendants did not take sufficient care to catch suspicious activity and therefore accidentally caused harm to prescription drug abusers and the state of West Virginia. Therefore we hold that there is at least a possibility of coverage under the Liberty Mutual CGL policy, and Liberty Mutual thus has a duty to defend J M Smith in the underlying action.

AFFIRMED

15